SIVER, Appellant, v. GUARANTEE INVESTMENT COMPANY.

Division One, June 20, 1904.

1. **LOTTERY: Bonds.** For a payment of $10 and a promised payment of $1.25 per month, a company issued to purchasers $1,000 bonds, the first to be numbered 1, the second 5, the third 2, the fourth 10, "and so on, reverting back to the first issued unpaid bond of the series, and alternating with the multiple of 5," and to be paid in this order out of the fund raised by the monthly installments of $1.25 as fast as there was a sufficiency of money on hand to pay them with. All bonds were numbered when printed and were issued in numerical order to the purchasers on application to the secretary of the company in the order in which by chance the application came to his hands by mail and were opened by him, so that the number of the bond the purchaser received was determined by that chance. According to the plan of payment promised the bonds bearing numbers which were multiples of five were more valuable than those bearing other numbers because they were to be paid as soon as there was money in "the trust fund" with which to pay them. The purchaser put up his money blind as to the number he was going to draw; if the number he drew was the multiple of five, he drew a prize; if not, he drew a bond subject to many contingencies. *Held,* that the bond issue was a cunning lottery scheme.

2. ———: ———: **Notes in Payment of Bonds.** The company becoming involved, it paid to plaintiffs $500 on each bond held by them, and gave its non-negotiable note for $500 for each bond so held and the bonds were surrendered, and those notes are the subject of this suit. *Held,* that the plaintiffs can not recover, because the notes were given in part settlement of bonds which were illegal because executed in pursuance to an unlawful scheme in the nature of a lottery.

3. ——: ——: ——: **Loan: the Facts Speak.** If the bonds were surrendered for one-half their face value in cash and the other half in notes, those notes were not a loan, whatever the parties may have called them at the time. Their legal effect is to be determined by the court from the facts in evidence, and not by what the parties denominated them.

Appeal from St. Louis City Circuit Court.—*Hon. Warwick Hough*, Judge.

AFFIRMED.

*Bishop & Cobbs* for appellant.

(1) The notes are not tainted with illegality, but are valid obligations. First. Because they constitute a new and independent contract. "A new contract founded on a new consideration, although in relation to property respecting which there had been unlawful transactions between the parties, is not itself unlawful." Armstrong v. Toler, 11 Wheat. 297; Allgear v. Walsh, 24 Mo. App. 134; Roselle v. Beckmeier, 134 Mo. 380; Hamilton v. Kane, 2 Hall 526. Second. Because they were given for money that belonged to the payees, and where one party recovers money which belongs to another, the courts will compel an accounting without inquiring into the nature of the transactions by which it was acquired. Wann v. Kelley, 5 Fed. 584; McBlair v. Gibbs, 17 How. 232; Cook v. Sherman, 20 Fed. 167; Norton v. Blinn, 39 Ohio St. 145; Charles v. McCune, 57 Mo. 166; Wolff v. Bernero, 14 Mo. App. 518; Attaway v. Bank, 15 Mo. App. 577. Third. Because, even where a partnership is formed for carrying on an unlawful business and the money made from such business actually comes into the hands of one of the partners for the benefit of the firm, the courts will order an accounting. Brooks v. Martin, 69 U. S. 70; De Leon v. Trevino, 49 Tex. 88; Railroad v. Railroad, 66 N. H. 100; Harvey v. Varney, 98 Mass. 118. (2) If the transaction in which the notes were given did not constitute an actual loan, it

was a settlement of a disputed demand and as such will not be disturbed. The compromise or surrender of a contested claim is a valid consideration for a note, although the claim proves to be non-enforcible itself. Mullanphy v. Riley, 10 Mo. 489; Reilly v. Chouquette, 18 Mo. 220; Rinehart v. Bills, 82 Mo. 534.   (3) Promissory notes, though non-negotiable, import a consideration.   It was, therefore, error to require plaintiff to prove a consideration for the sixteen notes before admitting them.   County of Montgomery v. Anchley, 92 Mo. 126; Crow v. Harrmon, 25 Mo. 417; Woodson v. Ritchie, 36 Mo. App. 506.

*John W. Noble* and *Geo. H. Shields* for respondent.

(1) Were the bonds issued by the defendant illegal as being issued on a plan in the nature of a lottery, the payment thereof being determined by lot or chance? This has been directly adjudicated as to the bonds of defendant company.   U. S. v. MacDonald, 59 Fed. 563; U. S. v. MacDonald, 63 Fed. 426.   The bonds were illegal.   The multiples of five were more valuable than other bonds.   The question of who got the more valuable bonds was determined by lot or chance, as the applications therefor were received by mail at the secretary's office, the bonds being numbered consecutively and issued in regular rotation in the order of the receipt of the application.   The payment of the bond was also a matter of chance, dependent upon the amount of business, the amount of lapses, the number of the bonds and whether or not it was a multiple of five.   U. S. v. MacDonald, 59 Fed. 563; U. S. v. MacDonald, 63 Fed. 426; U. S. v. Fulkerson, 74 Fed. 628; Holmes v. U. S., 147 U. S. 449; In re Rapier, 143 U. S. 134; State ex rel. Sheets v. Investment Co., 52 L. R. A. 530; U. S. v. Wallis, 58 Fed. 942.   (2)   Lotteries are forbidden by the Constitution and laws of the State of Missouri.   Constitution, art. 14, sec. 10; R. S. 1899, secs. 2219, 2220;

State v. Oschner, 9 Mo. App. 216; State v. Rotchschild, 19 Mo. App. 137; State v. Hammon, 60 Mo. App. 48. Lottery schemes are condemned as illegal and the courts refuse to enforce any contracts connected with them, and it is immaterial that a ticket in which the contract is concerned has already drawn a prize. Kitchen v. Greenabaum, 61 Mo. 110. (3). If a contract is connected with an illegal one, although a new contract, it is equally tainted, and a note given for a balance alleged to be due on an illegal bond is just as illegal as the bond and without consideration. Woolfolk v. Duncan, 80 Mo. App. 42; Bick v. Seal, 45 Mo. App. 475; Morris v. White, 83 Mo. App. 194; Armstrong v. Toler, 11 Wheat. 268; Buckingham v. Fitch, 18 Mo. App. 91; Fair Association v. Carmody, 151 Mo. 566; Hannauer v. Doane, 79 U. S. 342; Summers v. Summers, 54 Mo. 340; Harrison v. McCluney, 32 Mo. App. 481. Every contract growing out of or connected with the illegal contract is void. Swing v. Cider, etc., Co., 77 Mo. App. 391. (4) If the plaintiff can not open his case without displaying the illegal contract, his action must fail. Sprague v. Rooney, 104 Mo. 358; Fair Association v. Carmody, 151 Mo. 566; Garrett v. K. C., etc., Co., 113 Mo. 339; Board of Trade v. Brady, 78 Mo. App. 585; Ullman v. Fair Association, 167 Mo. 273; Keim v. Vette, 167 Mo. 389; Tyler v. Larrimore, 19 Mo. App. 445. An illegal contract can not be ratified. Gwinn v. Simes, 61 Mo. 338; Bick v. Seal, 45 Mo. App. 475; 15 Am. and Eng. Ency. Law, 995, 996. (5) This doctrine of illegality applies equally to trusts. And if there was a trust it was an illegal one and can not be enforced in court. Scudder v. Atwood, 55 Mo. App. 512; Roselle v. Bank, 141 Mo. 36; Chicago Co. v. Wabash Co., 61 Fed. 993; Nolan v. Congress, etc., Co., 57 N. Y. 518. In such cases the court will leave the parties where it finds them. If executory, it will not enforce the contract. If executed, it will not restore the price paid or the property delivered. Setter

v. Alvey, 15 Kan. 157; White v. Hunter, 23 N. H.; Fair Association v. Carmody, 151 Mo. 566.

VALLIANT, J.—This is a suit on seventeen non-negotiable promissory notes, one for $1,000, and the others for $500 each. The first is payable to the plaintiff, the others to different persons who assigned them to the plaintiff. There were several defenses pleaded, but we deem it sufficient to mention only one, as in our judgment that is conclusive of the case, that is, that the notes were given to the various payees in part settlement of bonds they respectively held that were issued by the defendant corporation, which bonds were illegal because they were executed in pursuance and were a part of an unlawful scheme in the nature of a lottery. The facts constituting the scheme are stated in the answer and will appear hereinafter.

This is a sample copy of the bonds:

"*Know all Men by these Presents,* that The Guarantee Investment Company of Nevada, Missouri, hereby promises to pay to . . . or order, at its office in Nevada, Missouri, one thousand dollars lawful money, at the time and on the conditions following, to-wit: This is one of a series of bonds of like tenor, numbered from No. 1 to the number borne by this bond sold and issued to the purchasers by the maker hereof. The holder hereof has paid for this bond ten dollars, and by accepting it agrees to pay the maker at its home office in Nevada, Missouri, on the first day of each successive month hereafter, an installment of one dollar and twenty-five cents until this bond matures. A failure for fifteen days to pay said installment subjects the holder or owner of the same as to fine of one dollar, which, together with the omitted installment, must be paid within the next fifteen days in order to reinstate the said bond. And if the same is not done within said time, this bond becomes null and void and of no effect, and the said holder hereof forfeits all payments and fines as-

sessed thereon to the fund for the payment of this series of bonds.

"It is hereby guaranteed by the maker of this bond that one dollar of all the monthly installments and all fines paid on the bonds of this series shall constitute a trust fund for the payment of the bonds of this company in the order and manner following; the first bond paid shall be Bond No. 1, the second bond paid shall be Bond No. 5, the third bond paid shall be Bond No. 2, the fourth bond paid shall be Bond No. 10, and so on, reverting back to the first issued, unforfeited, unpaid bond in this series, and alternating with the multiple of 5, until all bonds issued are paid; and said fund shall be honestly kept, guarded and applied to such purpose, and shall not be impaired, used or diminished for any other purpose whatever, and this bond, if unforfeited, becomes and is due and payable immediately after there are sufficient funds in said trust fund to pay it, all subsisting and uncancelled bonds issued and numbered prior to this having been paid.

"In witness whereof," etc.

The evidence on the part of the plaintiff tended to show as follows:

By-laws of the defendant corporation, article XI:

"Section 1. Each purchaser of a bond shall pay to the agent taking his application for a bond the sum of ten dollars, which sum shall go to the agent, or so much thereof as shall be agreed upon by and between the agent and this company, as his fee for securing the purchaser.

"Sec. 2. Each owner of a bond sold by this company shall pay, on the first day of each month, until his bond shall have been paid off or cancelled by the secretay of the company, the sum of one dollar and twenty-five cents, one dollar of which shall go into the fund set apart for paying off bonds, and when the amount thus paid in and set apart shall amount to one thousand dollars, the holders of the bonds will be paid by the com-

pany in accordance with the plan laid down in art. XII. The other twenty-five cents paid by each owner of a bond, per month, shall go to defray the expenses of the company and to pay the officers their salaries for services rendered, and the residue shall be paid to the stock-holders.

"Article XII:

"Bonds sold to purchasers will be paid to the legal holders thereof, according to the following table:

"TABLE FOR PAYMENT OF BONDS.

"Copyrighted, 1891, by J. G. Talbot.

| 1 then 5 | 11 then 55 |
|---|---|
| 2 then 10 | 12 then 60 |
| 3 then 15 | 13 then 65 |
| 4 then 20 | 14 then 70 |
| then 25 | then 75 |
| 6 then 30 | 16 then 80 |
| 7 then 35 | 17 then 85 |
| 8 then 40 | 18 then 90 |
| 9 then 45 | 19 then 95 |
| then 50 | then 100 |

(and so on up to 99 then 495), and continuing until the multiple extends beyond the number of bonds sold, when payment will revert back and bonds will be paid in their numerical order until by additional sales of bonds the suspended multiple number is reached, when that number will be paid and this manner of payment shall continue until all unforfeited, uncancelled bonds issued are paid.

"Article XIII:

"Section 1. In case the owner of a bond shall not pay the monthly installments of one dollar and twenty-five cents by the fifteenth of each month a fine of one dollar shall be paid by the holder of the bond so neglecting to pay when due, and the fine of one dollar shall go into the fund set apart for the payment of bonds, and if the monthly installments, together with the one

dollar fine, is not paid at the home office, or to a duly authorized agent, within thirty days from date it is due, the company, by its secretary, shall cancel the bond of the owner so neglecting to pay, and the sums of money paid by the owner so neglecting to pay, shall be forfeited to the trust fund for the payment of bonds. . .

Sec. 3. When the bond is allowed to lapse or become forfeited the same can never be revived, but the company shall pay the next bond, according to the table in Art. XII.

"Article XIV:

"There shall be a fee of one dollar charged for each and every transfer of bonds on the books of this company, which fee shall constitute a reserve fund for the purpose of paying off bonds which have been in force for five years, when the holder thereof elects to take his proportional share thereof, not to exceed the sum of three hundred and fifty dollars."

The payees of the notes sued on were holders of bonds of this character. Their bonds bore dates between June 6 and June 13, 1892, and were all multiples of 5, being numbered 1500, 1510, 1520, 1525, and so on to 1625, being 18 bonds. According to the scheme all bonds were numbered when printed and were issued in numerical order to the purchasers on application to the secretary in the order in which by chance the applications came to his hands by mail and were opened by him, so that the number of the bond any purchaser would receive was determined by that chance. According to the plan of payment promised the bonds bearing numbers which were multiples of five were more valuable than those bearing other numbers because they were to be paid as soon as there was money in "the trust fund" accumulated from the monthly payments of all the other bondholders.

Those investors who comprehended the scheme would sometimes purchase five bonds at one transaction so as to insure them at least one bond bearing a number

of the desired multiple, then allow the bonds of the intermediate numbers so purchased to lapse or be forfeited for non-payment of monthly dues, but the less wise or less informed did not always do so.

After these people had paid in from $30 to $35 on each bond held by them they were notified that there was a sufficient accumulation of money in "the trust fund" to pay their bonds and they were requested to forward the same to a certain bank for payment and they did so. But about that time the United States mail officials began proceedings to prevent the use of the mails for the business of the defendant corporation and there were some prosecutions growing out of it. The result was that "the trust fund " was encroached upon to defray the expenses of the litigation, so that when these bonds were presented they were not paid. A committee representing the bondholders was sent to St. Louis to investigate the matter and if possible collect the money due on the bonds. When the committee met the officers of the defendant corporation they were informed that there were thirty bonds in all matured and called in for payment, and that there had been $30,-000 accumulated to pay them, but in consequence of these prosecutions some of the money had been spent and there was not enough money to pay all of the thirty bonds.

There was some conflict between the statements of the plaintiff's witnesses as to the amount of the money they were told by the officers of the company was on hand, one witness thought it was about $21,500, the other said it was $11,000. The committee insisted that their eighteen bonds should be paid first as they were first to mature, but the company officers said they did not have the money to pay them and besides they needed some of the money to reorganize and get the company to going again on a plan that would not be obnoxious to the statutes of the United States in regard to the use of the

mails.   The result was the company paid the committee $500 in cash and a non-negotiable note for $500 on each bond and the bonds were surrendered.   The notes sued on are the notes given the committee in that transaction.   They were all assigned to the plaintiff to enable him to include them all in one suit; he holds them for the original payees.

At the close of the plaintiff's evidence the court at the request of the defendant instructed the jury that the plaintiff was not entitled to recover, the jury rendered a verdict in obedience to the instruction, and the court rendered judgment accordingly.   The plaintiff appeals.

## I.

That this bond issue was a cunning lottery scheme is very clear.  The purchaser put up his money, blind as to the number of the bond he was going to draw; if the number he drew was a multiple of five he drew a prize, if not he drew—perhaps not quite a blank, but a bond subject to so many contingencies and liable to so many deferments that if he did not realize its hopelessness at once, he probably would after paying his monthly dues for a long while.   The payees in these notes were not victims.   The soliciting agent through whom they made their purchases had been an officer of the corporation and understood the plan and these men were prepared to win the game, so to speak.   After paying from $30 to $35 on each bond the holder was notified that his investment had prospered and that $1,000 was in bank for him, and so it would have been, when he presented his bond for payment, if it had not been for the interference of the Government mail officers.

The scheme under which these bonds were issued has received judicial interpretation in the Federal courts in the Seventh circuit.   [United States v. Mc-Donald, 59 Fed. 563; same case on appeal, 63 Fed.

426.] Those courts held it to be a lottery and we think there can be no doubt about it.

## II.

But the main point upon which appellant insists is that whatever may be said of the original transactions evidenced by the bonds, the contracts evidenced by the notes sued on were independent new contracts and uncontaminated with the lottery vice.

The idea advanced is that the committee when it presented the bonds for payment agreed on request of the company to lend it one-half the amount due and take its notes for the money so loaned and these notes were the result. The plaintiff's witnesses testified that the transaction was a loan, so nominated by the members of the committee and by the officers of the company.

These same witnesses were confronted with their own depositions taken in another case in which they stated that they received $500 in cash and a note for $500 in payment of each bond; the loan theory was not advanced in those depositions. Appellant contends that even if there was a conflict in the testimony of the plaintiff's witnesses, it was not for the court, but for the jury to decide which statement was to be believed. And in that legal proposition the learned counsel are right.

But there was no real conflict in the evidence. It makes no difference what the witness called it, or that he gave the transaction one name at one time and another name at another time, or that in his opinion it amounted in law to one thing at one time and another thing at another time; the legal effect of the transaction is to be decided by the court, from the facts stated by the witness, and not by what the witness calls it or what any one else may have called it. The word loan may have been used, but the transaction was not a loan. The fact is the committee demanded the money on the bonds and could not get it, and at last unwillingly accepted half

in cash and half in notes and surrendered the bonds. The trial court ruled correctly on the evidence as a matter of law.

The judgment is affirmed.

All concur.