RUSSELL *v.* EQUITABLE LOAN & SECURITY COMPANY.

This case being for decision by a full bench of six Justices, and the Justices being equally divided in opinion, the judgment is affirmed by operation of law.

Argued February 20,—Decided October 5, 1907.

Equitable petition. Before Judge Pendleton. Fulton superior court. June 13, 1906.

Lewis C. Russell instituted suit against the Equitable Loan & Security Company, a corporation, in the superior court of Fulton county. In the petition it was alleged, among other things, as follows: "2. That your petitioner is the holder and owner . . of four certificates numbered 740, 742, 743, and 745 respectively, class A. 3. By the terms of said certificates the Equitable Loan & Security Company agreed, undertook, and obligated itself to pay . . the sum of $505.54 upon each of said certificates, making $2,022.16, should the holders of each of said certificates pay, as specified therein, 130 monthly instalments of $1.25 each upon each certificate. 4. The said certificates are identical in form, . . the only difference being that each certificate shows its proper number; and a copy of one of said certificates is hereto attached as a part of this petition and marked Exhibit A. 5. Your petitioner shows that upon his part he has fully complied with each and all of the stipulations, conditions, and requirements devolving upon him under said contract. 6. Having paid all dues and charges according to the requirements mentioned in paragraph 3, the said company is indebted to him in the sum of $2,022.16. 7. The said Equitable Loan & Security Company refuses to pay said sum of money according to its undertaking and obligation, though requested so to do and in duty bound thereto. . ." Other allegations were made which involved certain certificates known as "class B;" but as the judge did not pass upon them, it is unneces-

sary to set them out. Exhibit A, which is referred to in paragraph 4 of the plaintiff's petition, is as follows: "United States of America. Incorporated under the Laws of the State of Georgia. Equitable Loan & Security Company. Atlanta, Georgia. ($505.54). Class A. No. 2049. The Equitable Loan & Security Company of Atlanta, Georgia, promises to pay to——————of——————, Georgia, or order, at its home office in Atlanta, Ga., five hundred and five dollars and fifty-four cents ($505.54), upon the following express terms and conditions: 1. That there shall be paid by the holder to the maker hereof, at its home office in Atlanta, Georgia, without any other or further notice, an installment of one dollar and twenty-five cents ($1.25) on the fifth day of each and every succeeding month hereafter until one hundred and thirty installments shall have been thus paid, time being of the essence of this contract. 2nd. That the holder hereof shall surrender for cancellation this certificate whenever the same shall be called, upon the payment to him of its then redemption value, the maker reserving the right to call and pay the same before maturity under the following rules and regulations. Certificates paid before maturity shall be paid in the following order, to wit, the first paid shall be number one, the second paid shall be number three, the third paid shall be number nine, the fourth paid shall be number two, the fifth paid shall be number six, the sixth paid shall be number eighteen, the seventh paid shall be number twenty-seven, the eighth paid shall be number four, the ninth paid shall be number twelve, the tenth paid shall be number thirty-six, and so on, according to the table which is printed on the back hereof, and which table is hereby referred to and made a part of this contract. 3rd. That the redemption value of this certificate, if paid prior to its maturity, shall be fifteen dollars if paid one month after date, eighteen and 5/100 dollars if paid two months after date, twenty-one and 11/100 dollars if paid three months after date, twenty-four and 18-100 dollars if paid four months after date, twenty-seven and 26/100 dollars if paid five months after date, thirty and 25/100 dollars if paid six months after date, and so on, the redemption value increasing three dollars with each installment paid, besides interest at the rate of four per cent. per annum on the redemption value of said certificate for the month next preceding the date of re-

demption hereof. 4th. That of each and every installment paid, as aforesaid, the maker hereof shall place twenty-five cents to a reserve fund which shall be used and held for the protection of all live outstanding certificates issued by this company, and seventy-five cents to a redemption fund, which may be used as follows: (*a*) For paying certificates issued by this company in order and manner that they shall mature; (*b*) For paying off and retiring certificates prior to their maturity according to the terms herein-before stated; (*c*) For paying the heirs, executors, or administrators of any deceased holder hereof the sum that installments paid by such deceased may have contributed to the redemption and reserve funds, provided said certificate is in full force at death of holder and satisfactory proof of such death is furnished the maker hereof within sixty days after death occurs; and the remaining twenty-five cents and all transfer fees shall be used for the expenses of said company. 5th. That a failure to pay any one of said installments, when due, subjects the holder hereof to a fine of fifty cents, which, together with the omitted installment, must be paid by the fifth day of the next succeeding month; and if said installment and fine are not paid within the said time, then this certificate shall be null and void and of no value, and the holder hereof forfeits all payments and fines; provided, however, that this company will reinstate said certificate at any time within three months after such forfeiture, upon the holder hereof first paying all dues hereon, together with fines assessed at the rate of fifty cents for each payment in default. If this certificate shall, according to the plan of redemption herein stated, become payable after it shall have been forfeited and before its reinstatement, then it shall be entitled to payment the next month after its reinstatement. And provided further, that after six monthly installments shall have been paid in the manner herein provided, and all other stipulations herein shall have been fully complied with by the holder hereof, and such holder shall thereafter default in any subsequent installment, the maker agrees to issue to such defaulting holder a new certificate, which shall bear the next unsold number for an amount equal to the payments made on such defaulted certificate, less the amount deducted for expenses, which new certificate thus issued shall be non-assessable and shall bear interest at the rate of four per cent. per annum and shall be

payable in its regular order as per plan of redemption herein stated, provided application for such new certificate shall be made to the home office of the company and the old or defaulted certificate surrendered within three months after such defaulted certificate shall be cancelled on the books of the company. 6th. That all receipts and fines shall be paid into the redemption fund. 7th. That the contributions to the reserve and redemption funds may be loaned to the holders of certificates issued by this company upon terms and security to be accepted by the board of directors, provided that not more than one hundred dollars can be loaned on account of any one certificate and no loan can be made for a longer time than five years. 8th. That after the reserve fund shall have reached the sum of one hundred thousand dollars, the interest earnings therefrom may at the option of the board of directors of this company be applied to the redemption of certificates then in force issued by this company. And when the reserve fund shall have reached the sum of two hundred thousand dollars, then fifty per cent. or any other portion or all the further current contributions thereto may be applied to the redemption of certificates in force in like manner with the interest thereon when the board of directors shall so authorize. 9th. That no transfer of this certificate shall be valid or binding on the maker hereof until such transfer has been made in writing hereon and the same duly recorded on the books of the company at its home office, and for each transfer a fee of one dollar must be paid before a transfer will be made. 10th. That each and every transferee of this certificate accepts it subject to all the stipulations herein. 11th. That no statement made by any one except as herein set forth shall be binding on this company. 12th. That no part of the reserve, redemption, or other funds shall ever be loaned to any officer or director of this company. 13th. That no part of the reserve and redemption fund shall be loaned except (a) upon improved real estate within the incorporate limits of the city in which it is located, and then not in excess of fifty per cent. of its cash market value; (b) Upon government, State, county or city bonds that have never defaulted the payment of interest; and this provision can never be changed, except by the consent of every holder of live certificates issued by this company in class A. In witness whereof this company has caused this certificate to be executed in

its name and behalf, under its corporate seal, and by its president and secretary. This————day of————. Equitable Loan & Security Co. by H. E. W. Palmer, president; Jno. S. Owens, Secretary."

On the back of the certificate appears the following:

TABLE REFERRED TO IN BODY OF THIS CERTIFICATE.

READ FROM LEFT TO RIGHT.

| Numerical column. | | First multiple column. | | Second multiple column. | |
|---|---|---|---|---|---|
| | No. | | No. | | No. |
| Pay first | 1 | then | 3 | then | 9 |
| then | 2 | then | 6 | then | 18 |
| then | 4 | then | 12 | then | 27 |
| then | 5 | then | 15 | then | 36 |
| then | 7 | then | 21 | then | 45 |
| then | 8 | then | 24 | then | 54 |
| then | 10 | then | 30 | then | 63 |
| then | 11 | then | 33 | then | 72 |
| then | 13 | then | 39 | then | 81 |
| then | 14 | then | 42 | then | 90 |
| then | 16 | then | 48 | then | 99 |
| then | 17 | then | 51 | then | 108 |
| then | 19 | then | 57 | then | 117 |
| then | 20 | then | 60 | then | 126 |
| then | 22 | then | 66 | then | 135 |
| then | 23 | then | 69 | then | 144 |
| then | 25 | then | 75 | then | 153 |
| then | 26 | then | 78 | then | 162 |
| then | 28 | then | 84 | then | 171 |
| then | 29 | then | 87 | then | 180 |
| then | 31 | then | 93 | then | 189 |
| then | 32 | then | 96 | then | 198 |
| then | 34 | then | 102 | then | 207 |
| then | 35 | then | 105 | then | 216 |
| then | 37 | then | 111 | then | 225 |
| then | 38 | then | 114 | then | 234 |
| then | 40 | then | 120 | then | 243 |
| then | 41 | then | 123 | then | 252 |
| then | 43 | then | 129 | then | 261 |
| then | 44 | then | 132 | then | 270 |
| then | 46 | then | 138 | then | 279 |
| then | 47 | then | 141 | then | 288 |
| then | 49 | then | 147 | then | 297 |
| then | 50 | then | 150 | then | 306 |
| then | 52 | then | 156 | then | 315 |
| then | 53 | then | 159 | then | 324 |
| then | 55 | then | 165 | then | 333 |
| then | 56 | then | 168 | then | 342 |
| then | 58 | then | 174 | then | 351 |
| then | 59 | then | 177 | then | 360 |
| then | 61 | then | 183 | then | 369 |
| then | 62 | then | 186 | then | 378 |
| then | 64 | then | 192 | then | 387 |
| then | 65 | then | 195 | then | 396 |
| then | 67 | then | 201 | then | 405 |
| then | 68 | then | 204 | then | 414 |
| then | 70 | then | 210 | then | 423 |
| then | 71 | then | 213 | then | 432 |
| then | 73 | then | 219 | then | 441 |
| then | 74 | then | 222 | then | 450 |
| then | 76 | then | 228 | then | 459 |
| then | 77 | then | 231 | then | 468 |
| then | 79 | then | 237 | then | 477 |
| then | 80 | then | 240 | then | 486 |
| then | 82 | then | 246 | then | 495 |
| then | 83 | then | 249 | then | 504 |
| then | 85 | then | 255 | then | 513 |
| then | 86 | | | | |
| then | 88 | | | | |
| then | 89 | | | | |
| then | 91 | And so on. | | | |

The prayer of the petition, among other things not necessary to state, was for a judgment for the amount due upon the certificates. Upon the hearing the defendant demurred on eight grounds, of which the substance of the last only need be stated, for the reason that the court placed its ruling solely upon that ground, which presents the only question which is argued by counsel. That ground is as follows: "Defendant demurs generally to said petition, upon the ground that said certificates A show upon their faces that the contract evidenced by them is illegal and contrary to the public policy of this State, being in the nature of lottery contracts, which being true, a court of equity will not render its aid, either directly or indirectly, for their enforcement or collection." Upon consideration the court passed the following order: "After hearing argument of counsel on the foregoing demurrer, it is ordered that ground number eight be sustained and the case dismissed, it having, been stated by counsel for the plaintiff on the hearing that all matters connected with certificates B had been adjusted and the judgment was claimed only on certificates A." The plaintiff excepted.

*Anderson & Anderson,* for plaintiff.

*Peeples & Jordan,* for defendant.

ATKINSON, J. This is a suit for the recovery of the amount promised to be paid according to express stipulations by the Equitable Loan & Security Company, made in its certificates known as "Class A." There were no allegations in the plaintiff's petition showing the character of the company's business, its charter powers, the purpose of its organization, its assets or liabilities, or manner of transacting business. The petition consisted of a full recital of the contents of the certificates sued upon, and allegations to the effect that the plaintiff had paid the certificates to maturity in accordance with their stipulations, and that the company had refused payment in accordance with its promises. With nothing else appearing in the petition, the trial court sustained that ground of the defendant's demurrer in which the position was taken that the petition showed upon its face that the certificates declared upon were in the nature of a lottery, and for that reason were contrary to public policy, and collection could not be enforced. Exception was taken to that ruling, and we have nothing else for consideration. Similar certificates were involved in the case of *Equitable*

*Loan & Security Company* v. *Waring,* 117 *Ga.* 599, but for suffi-
cient reasons this court, in express terms, eliminated class A cer-
tificates from the ruling therein made. See page 649. Certifi-
cates of classes A and B are set forth in the majority opinion in
that case. A careful examination will show that the substantial
difference between the two classes consists of a difference in arriv-
ing at redemption values to obtain in the event the company elects
to redeem before maturity. In class A the value is fixed at certain
specifically named sums, if redeemed at certain times. See condi-
tion 3 in class A, page 644. In class B the values of redemption
at specified times are not specifically named, but the method of
ascertainment is given; that is to say, the redemption value at
any given time before maturity is "the full amount of the first
payment and all installments paid hereon, with interest on said
amount at the rate of 8 per cent. per annum, and its proportionate
share of all dividends or accumulations from fines, lapses, and in-
terest earned in excess of 8 per cent. per annum." See condition
2 in class B, page 650. Dealing with this provision in class B
certificates, the majority, admitting for the sake of the argument
that the element of chance entered into the certificates, for reasons
fully set forth by Mr. Justice Cobb in the opinion, held that there
was no element of prize, and consequently the certificates of that
class were not unlawful. Chief Justice Simmons and Mr. Jus-
tice Lamar, dissenting, held that in class B as well as in class
A certificates, under the evidence submitted, the element of prize
and chance appeared, which rendered both classes obnoxious to the
laws of this State. The court was unanimous in the conclusion
that in order to render the certificates of either class lottery con-
tracts and for that reason obnoxious to the laws of this State,
there must be somewhere in the enterprise a union of three ele-
ments, to wit, (*a*) consideration, (*b*) chance, (*c*) prize. The evi-
dence is not before us, which in that case played an important part
in inducing the conclusions expressed both in the majority and
dissenting opinions. What we shall say will deal with the case
on demurrer and refer strictly to the pleadings construed in the
light of our statutes. The Penal Code of this State, §406, pro-
vides that "If any person, either by himself or his agent, shall
sell or offer for sale, or procure for, or furnish to, any person any
ticket, number, combination, or chance, or anything representing

a chance in any lottery, gift enterprise, or other similar scheme
or device, whether such lottery, gift enterprise, or scheme shall be
operated in this State or not, he shall be guilty of·a misdemeanor."
Section 407 provides that "No person, by himself, or another,
·shall keep, maintain, employ, or carry on any lottery in this State,
or other scheme or device for the hazarding of any money or val-
uable thing." These statutes are. directed against lotteries, gift
enterprises, or other similar schemes. In a lottery there must be
union of the three elements, consideration, chance, and prize.
*Equitable Loan & Security Company* v. *Waring,* 117 *Ga.* 599. A
"gift enterprise" is a sporting artifice by which, for example, a
merchant or tradesman sells his wares for their market value, but,
by way of inducement, gives to each purchaser a ticket which en-
titles him to a chance to win certain prizes, to be determined after
the manner of a lottery. See *Meyer* v. *State,* 112 *Ga.* 23. As the
gift enterprise contemplates lottery, and lottery involves chance, it
follows that the element of chance is an essential of a gift enter-
prise. The expression "similar scheme," as used in these statutes,
necessarily refers to schemes like lotteries or gift enterprises, and
consequently the element of chance is essential to their existence.
These code sections are to be construed together, and the use of
the word "hazard," as employed in section 407, emphasizes the
construction which we have given. If the contracts are not for-
bidden under the express terms or policy of those statutes, the
court should not on account of them refuse, in a proper case, to
require their enforcement. As "chance" is an essential element
in either a "lottery," "gift enterprise," or "other similar scheme,"
it is proper to inquire, what is chance as contemplated in these
statutes? The chance here referred to is that chance which is
employed in connection with lottery schemes, where the attempt
is to attain certain ends, not by skill or any known or fixed rules,
but by the happening of a subsequent event, incapable of ascer-
tainment or accomplishment by means of human foresight or
ingenuity. If the result in a given transaction could be accom-
plished or foretold by the exercise of skill or foresight, its ascer-
tainment would not be attributed to chance, but to the exercise of
skill and foresight, and consequently to design. Chance and de-
sign are exactly opposite, and the presence of either will exclude
the other. Where design enters into a transaction, it immediately

partakes of the nature of contract and will be governed by other principles. In the gaming sense there is no chance whatever where either party has means of knowing the result at the inception of the wager. There may be fraud, but not chance. Such is the element of chance as contemplated in the statutes which we have quoted. The International Dictionary gives the general definition of chance as "the unknown or undefined cause of events that to us are uncertain or not subject to calculation; luck; fortune." The Cyclopedia of Law & Procedure, vol. 6, p. 890, defines chance thus: "Possibility; hazard; risk; or the result or issue of uncertain and unknown conditions or forces neither understandingly brought about by one's act nor pre-estimated by one's understanding." Illustrative of the definitions given, the case of *Meyer* v. *State,* supra, is in point. There a slot machine was employed. Whether a prize would be won or not depended upon an unknown display of cards which the machine would make. In several of the cases cited in the opinion other devices were employed, but each was of such character as to eliminate the idea of arriving at the result by human design. So in the case of Horner *v.* U. S., 147 U. S. 449. That case involved the sale of certain bonds issued by the Austrian government, which were to be paid at some period between one and thirty years after date, the date of payment to be ascertained by reference to the arbitrament of a wheel. In that case, the court, on page 462, approvingly quoted from Ballock *v.* State, 73 Md. 1, where it was said: "The investment may run one year, or it may run thirty years, according to the decision of the wheel. It can not be said that this is not a species of gambling and that it does not tend in any degree to promote a gambling spirit and a love of making gain through the chance of dice, cards, wheel, or other method of settling a contingency." It was not the mere contingency, but the method of settling the contingency, that introduced the objectionable element of chance. Wherever it is sought to employ the element of chance in any kind of lottery or gambling scheme, show is made of an attempt to displace the exercise of human design and employ in its stead some uncertain scheme or device, which, uninfluenced by any possible design of the parties, may, according to mere blind luck, designate a particular result. Inasmuch as chance is an element of lottery, we frequently find illustrations of the meaning

of chance made in the decision of lottery cases. The note found on page 168, which follows the decision of the case of People *v.* Lavin, 1 Am. & Eng. An. Cas. 165, is in point. There it is said: "If success in a guessing contest depends upon an exercise of judgment and the power of calculation, there can be no lottery. Barclay *v.* Pearson (1893), 2 Ch. 154. Thus it has been held that a reward offered by a newspaper for the successful guessing of the winning horses in a race is not a lottery.. Caminada *v.* Hulton, 17 Cox C. C. 307; Stoddart *v.* Sagar (1895), 2 Q. B. 474. Neither is horseracing for a stake a lottery. People *v.* Fallon, 152 N. Y. 12, affirming 4 N. Y. App. Div. 88; Matter of Dwyer (Supm. Ct. Spec. T.) 14 Misc. (N. Y.) 204. Similarly, betting on a horse-race or other contests of skill can not be considered a lottery. People *v.* Reilly, 50 Mich. 384, explained in People *v.* Elliott, 74 Mich. 264. Where a prize was to be awarded to the one who guessed the weight of a mass of soap, it was held that there was no lottery. Dunham *v.* St. Croix Soap Mfg. Co., 34 N. Bruns. 243. The offer of a prize for the most suitable name for a town, to be determined by a committee on its own judgment, has been held not to constitute a lottery. Holt *v.* Wood, 14 Pa. Co. Ct. 499. Whether the guessing in contests for prizes is dependent on skill and judgment to such an extent as to remove the transaction from the realm of chance, must depend upon the circumstances of such case."

Applying the absence-of-human-design test to certificates of class A, what are the recitals of the certificates which affirmatively show the element of chance? It does not appear that the certificates were issued in the first instance in pursuance of any plan involving any kind of contingency or uncertainty. It does not appear how they were issued. In the absence of anything to show affirmatively that the original holder obtained his certificates by any uncertain plan or other contingency, it will not be presumed that he did obtain them in such manner. It does not appear, therefore, that there was any chance involved in the issue of the certificates. If not issued in pursuance of a plan involving chance, the mere fact of the right of the company to redeem according to the table of multiples would not introduce the element of uncertainty. The holder of a given certificate designated by a number would know as certainly the order in which it would be paid un-

der the table of multiples as if they were to be redeemed in numerical order. For example, the holder of certificate number 9 would know, from the express terms of the certificate, that in the event the company should elect to call certificates for redemption, number 9 would be the third in order for redemption, just as he would have known that number 3 would have been third in order if the plan of redemption had been in numerical order. The redemption values at all periods of redemption are certain and stipulated. The holder has nothing to do in order to preserve the life of his certificate, except pay his dues at the several times specified. It does not appear that the company is dependent upon subscription or lapsing of other certificates for money with which to redeem. The company may employ certain portions of the money arising from subscriptions and lapses to the redemption of redeemable policies (see conditions numbers 2, 4, 6), but it nowhere appears that it is dependent upon that source of income. In the absence of something shown to the contrary, it will be presumed that the company has a legitimate business, and that its earnings from that business will authorize the payment of the redemption values promised to be paid. The recitals of the certificates are not such, upon the face, as to overcome that presumption. But it is insisted that the element of uncertainty is introduced by reason of the stipulations made in condition 5. For example, if there were no forfeitures or lapsing of any certificate, number 9 would be third in order for redemption, while if certificates numbers 1 and 3 should lapse, number 9 would be first in order. This presents only a contingency expressly created by contract and in full contemplation of the parties, and does not manifest that character of uncertainty which shows an absence of design. Forethought, consent, and design of the parties are manifest throughout the transaction. As a reasonable business proposition, the creation of the contingency and likewise its settlement were in advance expressly provided for by contract. Not in any sense were the creation or settlement submitted to the arbitrament of a machine or any other mere scheme of uncertainty. If the contingency happens which was provided for by contract, which advances the order of redemption of a given certificate from a lower to a higher rank, there is nothing else to be done to accomplish the advancement; the advancement goes by force of the contract. Many forms

of insurance policies and other classes of contracts which are up-
held everywhere may be found to embody stipulations as closely
kindred to chance as the provisions of certificates of class A. The
case of Public Clearing House v. Coyne, 194 U. S. 497, involves a
transaction which was held to be a lottery, Justice Peckham dis-
senting. In view of what has been said we do not deem it nec-
essary to comment upon that case. We only suggest that it is not
controlling here, and that the decision there rendered was after a
full hearing of all the facts, and not upon demurrer as in the pres-
ent case.

Thus far we have dealt only with the element of chance; and in
order not to be misunderstood with respect to prize, we may, in
the light of what has been said, make a few references to that ele-
ment of a lottery. It is not mere value of the thing to be obtained
that makes it a prize. Chance is a condition precedent to the ex-
istence of prize. A stipulation to furnish an article, however val-
uable, would not impress the article with the character of prize;
the transaction would be merely contractual. But the same arti-
cle, not obtained by stipulation, but through some scheme of
mere chance, founded upon consideration, would impress the arti-
cle with the character of prize. As the element of chance does not
appear from the face of the pleadings, it follows that the element
of prize is also absent, so far as the pleadings disclose. The plead-
ings in the case before us failing to show upon the face that the
certificates involved the element of chance or prize, the court was
not justified in dismissing the suit upon demurrer.

I am authorized to say that Presiding Justice Cobb and Asso-
ciate Justice Beck concur in the views above presented.

LUMPKIN, J. I can not concur in the views expressed by Mr.
Justice Atkinson. The fallacy underlying the opinion of my learned
brother is that it deals with the certificates sued on as single sepa-
rate contracts, disconnected from the general plan of operation of
the company which they disclose. On the face of each certificate it
is evident that it was only one of many, which it was contemplated
should be issued as part of a general scheme. The nature of the
scheme sufficiently appears, in my opinion, to show its illegality.
From the face of the certificates the following facts may fairly be
said to appear: The company exercised the business of issuing
certificates like these, in large numbers. Those on which the suit

was brought are of a class known as class A. The plan was for the subscribers to pay on each certificate $1.25 per month for 130 months. Of each installment twenty-five cents was used for expenses, leaving one dollar net to be used by the company, or an aggregate for the whole time of $130. Of each $1 thus paid in, twenty-five cents was placed in the reserve fund, for the protection of live outstanding certificates. This was all which was required to be thus held. The other seventy-five cents was to be carried to a redemption fund. This could be used to pay off certificates maturing, or before maturity according to a multiple table presently to be referred to, or for returning the $1 per month to representatives of deceased certificate-holders. The contributions to the reserve and redemption funds might be loaned to certificate-holders upon their certificates, or they might be loaned with real estate or bonds as security. For these installments the company agreed to pay to the holder, at the end of the period, $505.54. Certificates could be called in before maturity. Certificates paid before maturity were to be paid in the following order: first, No. 1, then No. 3, then No. 9, then No. 2, then No. 6, then No. 18, and so on indefinitely under a multiple table based on 3. If paid prior to maturity, the redemption value should be $15 if paid one month after date; $18.05 if paid in two months; $21.11 if paid in three months, and so on, the redemption value increasing $3 with each installment paid, besides interest at four per cent. on the redemption value for the preceding month. For a failure to pay installments on any certificate a forfeiture would result. Thus, omitting the expense item, the plan or scheme was to promise large numbers of people $505.54 for each $130 paid in monthly installments during 130 months (ten years and ten months), or nearly 390 per cent. of the total payments (about 70 per cent. per annum on the amount for the average time of the payments) ; or, to those who should be paid off by the use of the multiple table, $15 for a total of $1.25 paid in, if the certificate should be paid in one month, or 1200 per cent. of the amount paid in,—1500 per cent. of the $1 having an earning capacity. Other fixed sums would be paid at times later than the first month, all entirely without regard to what the money paid in might earn. If they loaned out the money in the reserve or redemption funds, in this State they could only lawfully charge 8 per cent. per annum interest, while they

promised the enormous percentages above mentioned. Whence were they to come? If all remained in, nothing short of a financial miracle could make payment possible. It was alone through lapses of many that some could hope for redemption. These lapses played a double part in the transaction: The whole scheme evidently looked to the uncertain chance of the ruin of some for the possibility of complying with the promises to others. It was based and founded on the possibility of lapses. This is a wholly different thing from a life-insurance company, which lays aside a reserve that, at some reasonable and fixed rate of interest, is estimated to accumulate enough to meet the policy at maturity, according to tables of expectancy. The States, generally if not universally, by statute now require this to be done. Lapses may add to profits, but are not the sine qua non in any legitimate business. Nor is there any analogy between such a scheme and the contracts of indemnity involved in fire, marine, or accident insurance.

The effect of lapses on the numbers of the certificates to be called in under the multiple table is to create a mere hazard or chance. To take a simple illustration: Let us suppose that at the end of five months after starting, for the first time a payment was to be made, of twenty certificates, which would they be? By the table Nos. 1, 3, 9, 2, 6, 18, 27, 4, 12, 36, 5, 15, 45, 54, 7, 21, 63, 8, 24, 72. Suppose five of these had lapsed (say 1, 12, 8, 24, and 72), then five others would have to take their places, and thus become subject to redemption by the accident of lapses *before other certificates of earlier date.* The regular numerical order of issuance did not fix the order of payment. "And the multiple table was subject to shifting and uncertainty by lapses. It is said that there is no evidence here that the purchasers took the certificates in numerical order, and could not select the number desired, so as to choose a number subject to redemption by the table. It does not clearly appear that this was universally true; but there is an indication that such was generally the case, and that under some circumstances it was certainly so. In the fifth paragraph of the certificate it was provided that after sixty installments had been paid, if a default should then take place, the holder might apply within a limited time, surrender his old certificate, and have a new one issued to him for the amount paid in, less the amount carried to expense fund, *"which shall bear the next unsold num-*

*ber."* This indicates that the certificates sold were numbered in regular order. If the one thus numbered happened to be named in the multiple table as subject to early redemption, no other purchaser could choose and buy it. If it happened not to be so, the taker could not ask for a different number.

But it is said that the language of the certificate as to redeeming and paying the arbitrary amounts fixed (prizes) was permissive. While the words are permissive in form, it is palpable that the scheme was to hold out early redemption at arbitrarily large amounts as a method of doing business. After deducting 25 per cent. from each installment paid, for expenses, of the remaining $1 it was declared that seventy-five cents should be placed to "a redemption fund." What is a redemption fund, if not a fund with which it is intended to redeem? What was the meaning of declaring that the redemption value of a certificate "shall be fifteen dollars if paid one month after date," if it was not intended to hold out a possible redemption in one month? How? By the use of the multiple table and possible lapses. True it is said that the redemption fund "may be used" to pay for redeeming before maturity. But it is also said that the fund "may be used" to return to the estate of a deceased certificate-holder the amount paid in by him (less the expense deduction). Suppose that the administrator of such decedent should call for his money within the time limited, would it be any answer to say to him: "We merely said we 'may' pay you, not that we would do so"? Or suppose that a lottery company should issue tickets stating that they "may" have drawings, not positively that they will do so, would this be any reply to a charge that they would be conducting a lottery scheme?

In *Equitable Loan & Security Company* v. *Waring,* 117 *Ga.* 599, the nature of this company and of its certificates was fully considered. Certificates like the one now before us, belonging to class A, were practically treated as unlawful both by the majority and the minority of the court (pp. 602 (1), 652), though the majority of the court did not pass upon the question. The main point of difference was whether a new series of certificates known as class B, issued after the United States mails had been closed to class A, was legal or not. Three of the Justices held that they were. Two dissented. One was absent. The writer of this, then

on the bench of the superior court, wrote an opinion, expressing his views, which will be found published in 117 *Ga.* 604, et seq. In that case, the facts were more fully developed by evidence than they here appear; but under what was there said and the authorities cited, I am of opinion that enough appears to hold that this scheme was a lottery, or at least a similar scheme or device, and contrary to public policy. In the case just referred to, Mr. Justice Cobb, in delivering the opinion of the majority, said of certificates of class B (p. 662) : "If under the contract no certificate can ever be called for redemption until it has earned at least eight per cent., then there is no element of prize in the contract." He construed the certificates of class B not to be subject to be redeemed until they had earned eight per cent. This can not be said of certificates of class A. By inference from this statement of Mr. Justice Cobb, there was a prize element in class A. And if what has been said above, as to the issuing and numbering of the certificates, the chance application of a multiple table thereto, the effect of lapses on the application of the multiple table, and the gathering by chance lapses and distributing by chance numbers, is correct, then the scheme indicated on the face of the certificates was a scheme or device in the nature of a lottery, and contrary to public policy. It is suggested that the company might have had other money not arising from the sale of certificates, and might use it to meet them at maturity. The reply is that the suggestion goes to the solvency of the company, not to the legality of the scheme of which the certificates sued on form a part. But it may be remarked that the certificates indicate that the company was conducting the business of dealing in these certificates (which I think illegal), for profit, charging 20 per cent. of all installments, and all transfer fees, for expenses. There was nothing to indicate that they did anything else; nor can we well assume or infer from what appears that this scheme was designed as a mode of giving away money outside of that gathered in. Design which distinguishes a legitimate business from an illegitimate one does not mean merely the design to conduct, for a consideration, a scheme of chance, with prizes to the fortunate.

The company has invoked a ruling, by its demurrer, that its class A certificates were illegal; and I think the demurrer was properly sustained. For recent cases on the subject see Siver *v.*

Guarantee Investment Co., 183 Mo. 41 (81 S. W. 1098); State v. Nebraska Home Co., 66 Neb. 349 (60 L. R. A. 448, and note); Stevens v. Cincinnati Times-Star, 72 Ohio St. 112 (73 N. E. 1058).

I am authorized to state that Chief Justice Fish and Mr. Justice Evans concur in the views expressed.