### 17064.   HOBBS *v.* K. & S. SALES COMPANY

Whether the operation of a gambling scheme or device was intended when the plaintiff shipped to the defendant the "punch-board" with the articles of merchandise, for the price of which the plaintiff sued in this action, and whether there was an actual purchase of the goods by the defendant, were issues which, under the evidence, should have been submitted to the jury, to be determined by them; and the court erred in directing a verdict for the plaintiff.

DECIDED APRIL 14, 1926.

Complaint; from city court of Soperton—Judge Blount presiding. November 20, 1925.

*Saffold & Sharpe, Dallam B. Jackson,* for plaintiff in error.

*M. B. Calhoun,* contra.

LUKE, J. The K. & S. Sales Company sued P. O. Hobbs on an open account for $146.13 and interest thereon. Attached to the petition was a sworn itemized statement of the account as follows:

| | | | |
|---|---|---|---:|
| 11-19-24 5-5021 | No. 24376 | | $150.00 |
| 2-20-25 | Cash on account | | 3.87 |
| | | | $146.13 |
| 1/12 Doz. | Elgin watch | | $ 40.00 |
| 1/6 " | Gents sets | | 15.50 |
| 1/6 " | Smoker sets | | 15.00 |
| 1/6 " | Redmanol pipes | | 22.00 |
| 1/6 " | Manicure sets | | 30.00 |
| 1/12 " | Opera glasses | | 25.00 |
| 1/12 " | Kodak | | 25.00 |
| 1/12 " | Pearl necklace | | 15.00 |

Gaming, 27 C. J. p. 1104, n. 7.

| 1/6 | " | Bracelets | . . . . . . . . . . | 10.00 |
| 1/6 | " | Stick pins | . . . . . . . . . . | 10.00 |
| 1/6 | " | Belt buckles | . . . . . . . . | 20.00 |
| 1/6 | " | Watch charms | . . . . . . . | 10.00 |
| 1/3 | " | Bill folds | . . . . . . . . . | 4.50 |

Velvet display pad, ribbon and wire

|  | $250.00 |
| Less 40% . . . . . . . . . . . . . . . | 100.00 |
|  | $150.00 |

Defendant filed an answer denying all indebtedness, and an amendment to his answer as follows: "Defendant says that the articles shown in itemized account attached to plaintiff's petition came attached to a punch-board and was a part and parcel of the same; that any person who played on said board for 5 cents a punch would receive nothing whatever for his money, or would receive one of the articles attached thereto and the same articles set out in plaintiff's petition; that when all of said punches were sold and punched out, the amount received from said punches would be $250.00, and of this amount plaintiff received 60%, and that said punch-board sold under said conditions is a gambling device, and for this reason the contract is void, and that it was the intention of plaintiff that same was to be handled in this way, and said sale and contract is therefore null, void, and illegal." The plaintiff introduced the interrogatories of its man in charge of the shipment of merchandise, who swore that he shipped the goods to the defendant in accordance with an order which was attached to his interrogatories. He testified: "The assortment or shipment I shipped to him was billed and sold as a job lot, at a stipulated price for the lot itself, the K. & S. Sales Company to determine what articles would comprise this particular job lot." In his cross-interrogatories he swore: "I do not recall if a punchboard was shipped with this particular order, but [if?] it was, there was no charge made for it, and its use is optional on the part of the purchaser of the goods. The goods were sold on open account." The alleged order attached to the interrogatories was in substance a letter asking the defendant if a sales board, "sometimes called punch-board," could be sent to him on approval, and at the bottom of the letter was the following: "Your discount

40%—express charges paid. Shipment strictly on approval. Unsalable merchandise returnable." The defendant, by his signature to this letter from the plaintiff, agreed for the goods to be sent *on approval.*

The defendant testified: "I received a punch-board and assortment of premiums on approval. I was to keep the goods and punch-board 45 days and see how many punches I could sell or get rid of during this 45 days, and at the end of this time I was to return all goods not taken off as premiums or disposed of, and if at the end of 45 days I wanted to keep the goods I could do so, and if for any reason I did not want to accept the goods I was to return the entire business at the expiration of 45 days. I never did purchase the goods or accept them as my property, but was just taking them on approval. I had never accepted the goods, nor had I agreed to buy or pay for them. It was not even necessary for me to agree to do this until the expiration of the 45 days. The assortment of goods were never itemized to me, and the itemized list offered in evidence here to-day is the first one I have ever seen from this company. They were just sent out as an assortment for which they were to charge me $150 in case I accepted them. In case I did not accept them I was to send them 60% of all monies collected by me for punches. I was to collect 5 cents for each punch and remit 60% or 3 cents for each punch and retain 40% or 2 cents for each punch. The merchandise shipped out to me was stolen from my store and I have never recovered any of it. I was in no way responsible for the loss of the goods. I spent quite a bit of money and time trying to capture the man that stole the goods, as well as to recover the merchandise. I used every effort and did all I could, and all that could be done to get the goods back and to catch the thief. I used more than ordinary diligence and care in protecting and keeping these goods in good condition, as I was going to return them to the K. & S. Company before the 45 days had expired. The company had already sent me an agreement to be signed by me, allowing me to keep the goods for a longer period of time strictly on approval, but I did not intend keeping them longer, nor did I intend signing this agreement. There was 129 punches punched off this board when same was stolen, for which I received the sum of $6.45 or 5 cents each, and of this amount I remitted $3.87 or 60% to the K. & S.

Sales Company, retaining the balance, or 40%, for myself, as per our agreement and contract. There had never been anything taken off this board on which the merchandise was attached when same was stolen on January 2, 1925. Under the contract and agreement, fully understood by the company, I could not take anything off this assortment or deliver anything on the assortment to any person, only the person who punched the number from the punchboard that called for this premium or article of merchandise. At the time this merchandise was stolen there had never been a single number punched off this board that entitled the party punching same to any article of merchandise on the board to which the assortment was attached. *I could not sell any article on this assortment to any one at any price,* and this was fully understood by the company and agreed to by them, *and this was the condition on which this merchandise was shipped to me.* I could, under the contract under which this merchandise was shipped to me, deliver the various articles of this assortment only when a number was punched off the punch-board that entitled the party punching same to a premium, all of which was determined by a hidden number. The goods of this assortment under the contract were worth nothing to me, and I could not under the agreement sell any of this merchandise to any person at any price. They were never billed out to me at any price whatever, and *I never in any way agreed to purchase them* or keep them at any price. The time I had to decide if I wished to keep these goods had not expired. I wired the company the next day after this board was stolen together with every article of merchandise. The person who stole these goods came to my store and asked for some small article which I delivered to him. This did not require me to go any distance from him. He then asked for some shoe polish, and, as I had to go to the back of my store to get this, he snatched the assortment of merchandise, together with the board on which it was attached, and jumped in a car and drove off as fast as he could. I am a cripple man and could not get back to the front of the store until he was some distance up the road and too far for me to stop him. I did, however, wire to all the sheriffs and police around in the direction he was going, and the sheriff at Mount Vernon got after this man and finally forced him to abandon his car. He left this board on which all the goods were attached in the car, but had

stripped off every article therefrom. I did not get back one cent of the merchandise. There was $14.00 in United States money on the board. This I notice is not charged to me on the itemized statement offered by the company. I am sure no company would give away this amount of money, nor would any company allow me 40% of each dollar to sell them for the company. I have never purchased one thing from this company, and was only holding these goods, at the time they were stolen, *for the company,* and until the 45 days was out I had them strictly on approval." (Italics ours.) Defendant "identified the punch-board" on which the assortment of merchandise was attached, "together with the case in which these were received by him, all of which came in one container." The defendant introduced a letter from the plaintiff saying that the goods were sent "strictly on approval," and saying: "Your discount (profit) is 40%. Should you sell only part of the merchandise, you still make your 40% discount, because we repurchase all unsalable merchandise." Defendant introduced in evidence also the invoice showing "one assortment No. 5-5021 5000-5c assortment."

The trial judge directed a verdict for the plaintiff, and the defendant, upon the overruling of his motion for a new trial, excepted.

If the evidence of the plaintiff is to be believed, there was an ordinary sale of merchandise on open account, and no gambling scheme was intended by the plaintiff. If the evidence of the defendant is to be believed, there was no sale of merchandise, but the defendant held the goods merely on approval, and the contract between the plaintiff and the defendant contemplated the operation of a gambling scheme or device, and said contract between the parties litigant was in pursuance and in furtherance of that object. According to defendant's testimony, a punch-board was sent with the merchandise and the purchaser (from the defendant) paid five cents for a punch on this board which was furnished by the plaintiff, and for this five cents the purchaser either got nothing at all, or else got an article which, according to the itemized statement of the plaintiff, was worth much more than five cents. This is clearly a game of chance, and is prohibited by sections 397 and 398 of the Penal Code of Georgia.

That the plaintiff participated in this scheme, was a party there-

to, intended that the merchandise should be used as a part and in furtherance of the gambling scheme, and was to reap a part of the benefit from the scheme, is shown by the following facts as disclosed by the record, the credibility of which the jury should have determined: (1) Plaintiff sent with the merchandise a punch-board containing lucky numbers that called for premiums,—the merchandise. No reason is shown for sending this punch-board unless the plaintiff intended for it to be used. It was sent in the container with the merchandise. (2) Plaintiff's letters refer to the sales-board assortment "sometimes called punch-boards," which tends to show that the nature of the transaction was understood by them. (3) Plaintiff's invoice was for "5000-5c assortment." What would the jury believe this "5c" referred to if not to five cents a punch on the board which the plaintiff sent? The cheapest article on the itemized statement was $4.50. (4) At the time the board was stolen the defendant had sold 129 punches off the board at 5 cents each. 60% of this amount was sent to the plaintiff, and the plaintiff gave the defendant credit for the same. (5) Plaintiff never submitted to the defendant the prices of the various articles of merchandise, and the invoice contained no reference thereto. This being true, the defendant, not knowing the cost of the individual articles, could not know at what price to sell them; which was necessarily known to the plaintiff. (6) $14 in United States money was on the board to make it look attractive and luring to the purchaser of the punches, which money was furnished by the plaintiff and was not included in the itemized statement submitted at the time of suit. Why should the plaintiff send this money with a bill of merchandise? Surely it was not intended that it be sold as an article of merchandise and 40% of the proceeds thereof retained by the defendant. The record shows that the plaintiff furnished it, and that the plaintiff expected it to be returned after it had served its purpose, for the plaintiff wrote to the defendant, "When you return any of the coins or currency on this assortment please remove them from the display pad." The fact that it was to be returned indicates that there was no number which could draw it, among the punches; and if this were true, having it on the board was a fraud on the public. (7) The plaintiff "determined what articles would comprise this particular job

lot." (8) The plaintiff was to get back all articles not· utilized and 60% of all monies realized from the project.

The entire record tends to show that the device in question was a gambling scheme, and that the plaintiff so understood and intended, participated therein, and reaped part of the benefit therefrom. The seemingly guarded methods of the plaintiff to make it appear that this was a legitimate sale of merchandise for a legitimate purpose "will not serve to conceal the real illegality of the scheme," if such it was. *Glennville Investment Co.* v. *Grace,* 134 *Ga.* 576 (68 S. E. 301, 29 L. R. A. (N. S.) 758). See, in this connection, *Meyer* v. *State,* 112 *Ga.* 23 (37 S. E. 96, 51 L. R. A. 496, 81 Am. St. R. 17) ; *Wilson* v. *State,* 67 *Ga.* 658 (2), 660 (2) ; *Henderson* v. *State,* 95 *Ga.* 326 (2) (22 S. E. 537) ; *Whitley* v. *McConnell,* 133 *Ga.* 739, 740 (66 S. E. 933, 27 L. R. A. (N. S.) 287, 134 Am. St. R. 223) ; *Stanbridge* v. *Williford &c. Co.,* 148 *Ga.* 283 (96 S. E. 498). Gaming contracts are void (Civil Code, § 4256), and all contracts intentionally made in abetment of a violation of the penal statutes of our State are unenforceable. If not unenforceable for any other reason, such a contract would be unenforceable as being against public policy. There was evidence from which the jury could have concluded that the contract between the plaintiff and the defendant contemplated the violation of a penal statute in which both parties participated; and had the jury so concluded, and had they been properly instructed by the court as to the validity of such a contract, they probably would have rendered a different verdict.

Let it be borne in mind that this is not a suit upon a written contract. Paragraph 3 of the plaintiff's petition specifically alleges that "said indebtedness is evidenced by an open account." This being true, the parol-evidence rule in reference to varying the terms of a written contract could not properly be invoked; and the defendant showed by parol evidence, as well as by documentary evidence, that he had never purchased the goods, but that he accepted them only on approval, and that they were the property of the plaintiff at the time they were stolen. Even if the suit had been based upon the letter in which there was an offer by the plaintiff and an agreement by the defendant that the goods be shipped *on approval,* the letter is not sufficiently definite to constitute a written contract of sale, and could be explained by parol evidence.

What did the 40% in that letter refer to, the five cent punches or the specific articles of merchandise? If it referred to the articles of merchandise, and some of them were sold and some returned to plaintiff, what method would be employed to ascertain 40% of the merchandise sold, since the defendant, according to the testimony, never had any notice of the value of each article until the itemized statement was made at the time the suit was filed. Under these circumstances, which party would have determined what was 40% of the value of any merchandise that might have been sold? This alleged order simply provided that the goods be shipped on approval, and there is no conclusive evidence in the record to show that they were ever actually accepted by the defendant. The defendant had 45 days in which to accept or reject them. The 45 days had not expired at the time of the theft, and the defendant swore: "I was going to return them to the K. & S. Company before the 45 days had expired." There was no acceptance shown by a sale of the goods by the defendant, because the undisputed evidence shows that none of the goods were sold at the time they were stolen. The sale of the punches does not show an acceptance of the goods because the plaintiff, according to its evidence, did not sell defendant the punch-board or include it in the account sued for, and disclaims all responsibility for its use. If the goods were in the possession of the defendant merely on approval, and had never been accepted by him, they were held by him in the nature of a consignment, so far as title is concerned, and the title to them was still in the plaintiff at the time of the theft. This being true, he would be responsible only for that degree of diligence in protecting them which the evidence tends to show he exercised. It could be properly inferred that the plaintiff intended to keep the goods in the possession of the defendant "on approval" only, so that they would be in position to recover the goods themselves should the occasion arise, for the defendant testified: "That company had already sent me an agreement to be signed by me, allowing me to keep the goods for a longer period of time strictly on approval." This tends to show that the plaintiff considered them to be in the hands of the defendant on approval even after he was selling the punches on the board.

The testimony of the plaintiff's witness was that he did not recall if a punch-board was shipped. and that if it was, its use was

optional on the part of the defendant. That of the defendant was that the plaintiff did ship a punch-board and intended for it to be used in operating a game of chance. The testimony of the plaintiff shows that the goods were to be sold by the defendant "in any manner in which he wanted to dispose of them." The defendant swore: "Under the contract and agreement, fully understood by the company, I could not take anything off this assortment or deliver anything on the assortment to any person, only the person who punched the number from the punch-board that called for this premium or article of merchandise." The plaintiff swore that the defendant bought the goods. The defendant swore: "I never in any way agreed to purchase them or keep them at any price." Under this conflicting evidence, what was the intention of the parties? What was the nature of the contract? In whom was the title to the goods at the time they were stolen? In this particular case these are questions of fact, and should have been submitted to a jury, and the court erred in directing a verdict.

*Judgment reversed. Broyles, C. J., concurs. Bloodworth, J., not participating, on account of illness.*