## GLENNVILLE INVESTMENT COMPANY *v.* GRACE.

Where an owner of land divided it into a considerable number of lots, varying widely in value, and made contracts purporting to sell a certain number of lots to various parties, without reference to what lots were to be sold to any particular person, this being left for determination later, and after a certain number of "applications" had been sold, at an appointed time the names of purchasers were by a committee of such purchasers put into one box and the numbers of the lots placed in another, under rules prescribed by and at the direction of the seller, and names and numbers were drawn, the agreement being that the lots drawn in connection with the name of a purchaser should be conveyed to him by the seller, this was a lottery scheme and illegal; and such an agreement was not enforceable by an equitable proceeding for specific performance, brought by one who drew certain lots.

JUNE 15, 1910.

Petition for specific performance, etc.    Before Judge Rawlings. Tattnall superior court.    July 12, 1909.

B. H. Grace brought his equitable petition against the Glennville Investment Company, alleging as follows: On June 15, 1907, plaintiff bought from the defendant ten lots of land in the city of Glennville, Georgia, as evidenced by a written contract containing the following terms: "This is to certify that the Glennville Investment Co. has received of B. H. Grace, County Toombs, State Ga., one hundred dollars, the first installment deposit on application of ten lots, stores, dwellings, or other buildings in Glennville, Tattnall County, Ga.    The deferred payment on same to be paid to the Glennville Bank either by registered letter, Post Office Money Order, Express Money Order, or Savannah, Atlanta, or New York exchange, as follows: $900.00 six months after this date.    Said Glennville Bank will give receipts for all deferred payments by crediting the accepted drafts drawn on the applicant by this com-

pany; and when all deferred payments are made, said bank will deliver draft as paid in full, entitling applicant to warranty deed to ten lots, stores, dwellings, or other buildings on the day of opening without further expense.    The contract on the back hereof is to constitute a part of this receipt.    Salesman No. 1 and name J. A. Wheeler.    No. 10 lots."    On back of contract: "It is hereby mutually agreed between Glennville Investment Co., the undersigned, and the other holders in this enterprise, as follows: First. You will have no taxes to pay until after 1907.    Second.  Each applicant holder certificate of final payment shall be entitled to a warranty deed to the lot or lots or parcels of land of which he may be the purchaser, immediately after the opening.    Third. Where ten applications are sold in one town, the applicant must select one man to attend the opening, and all purchasers must be represented either in person or by proxy.    Fourth.  The opening and distribution of these lots and land will be conducted on a plan entirely in keeping with the law, and fair to all, and shall be agreed upon by a majority of the purchasers present.    The company will furnish warranty deeds for them to distribute, divide, or dispose of their lots and lands in common in any lawful manner they may elect.    Each application paid for in full will represent one unit interest in the whole number of lots, stores, dwellings, or other property until the distribution and division.    Fifth.  Should any applicant make first deposit and fail or refuse to make final settlements, he will forfeit former deposits after ten days grace, without notice, and the money paid by him shall be retained by the company as liquidated damages, time being the essence of the within instrument in respect to said payments, and such payments shall be considered as payments for the option of buying said property, and therefore forfeited.    Sixth.   The Glennville Investment Co. will not be responsible for any representation made by any salesman other [than] that found in their printed literature.    Seventh.  You will not be required to build on lots.    Eighth.  No application will be sold to negroes.   No negroes now own any land in the corporate limits of Glennville.    Ninth.  Should any applicant die after having purchased four or less applications in this enterprise, and having paid 50% or more of his deferred payments, then this company will donate the remaining part of his indebtedness to his family or legal representatives.    Tenth.   The opening day will not be later

than Feb. 1, 1908.    But will be as much sooner as it is possible to make it."    (Signed by the company and the applicant.)

The plaintiff paid the sum of $100, and agreed to pay $900 more in six months.    The defendant drew a draft on him for that amount, which he accepted.    The defendant deposited the draft in the Toombs County Bank, and drew upon it the full face value less discount.    At the maturity of the draft, by reason of a panic, he was unable to meet it, and arranged with the bank to "carry him over for a short time."    On February 4, 1908, he started to the town where the bank was located, in order to take up the draft, according to an arrangement which he had made with one of the directors of the bank for that purpose.    On his way he learned that on that morning the defendant had paid the draft to the bank and taken possession of it.    On December 12, 1907, he had requested the defendant to meet the draft for him, and the latter refused to do so.    He then "arranged said draft with the said bank as above set out."    On the day the draft fell due he inquired at the Glennville Bank, the place designated for payment, for the draft.    It was not there, and had not been since it was sold to the Toombs County Bank.    "Your petitioner shows that the drawing of the lots of land under and by virtue of said contract, as shown by exhibit A, was not to be later than February 1, 1908, for the opening day.    Your petitioner shows that on the third day of February, 1908, the proper committee met and considered all applications for drawing as provided by said contracts and rules of the said company, your petitioner holding and owning said contract marked Exhibit A.    .    .    Your petitioner shows that the said committee of five, at the direction of the proper officer of the said defendant, placed the name of your petitioner in the box for drawing his said ten lots so purchased and paid for.    Your petitioner shows that he drew by said arrangement the following lots of land, to wit:    [naming by number and block eight lots.]    Your petitioner shows, that he drew the above-named eight lots at said drawing; that he endeavored to ascertain the other two lots he drew, and the said defendant refused to tell him the number of the other two lots he so drew.    Your petitioner shows that he was eligible to draw lots until he drew lot number 14 in block 104, on which lot of land there is located a first-class brick store worth, together with the said land, the sum of $3000.    And after the drawing was completed and it cropped

out that your petitioner had good luck, [and] incidentally ascertained the number of the above lot he so drew, the said defendant refused to tell the number of the other two lots, and also declared that your petitioner had no right to the lots he had drawn. . . Your petitioner shows that one other lot he drew is now valuable, in that he is to receive in cash $250.00, or buildings erected thereon to that value. But your petitioner does not know which lot it is. Your petitioner further shows that he verily believes that the other two lots, the numbers not known to your petitioner, are valuable indeed, their value and location not known to your petitioner." On the day following the drawing, the defendant employed a lawyer and caused him to hasten to the town where the bank which held the draft was located, and pay it off. This attorney arrived at the bank about two hours and a half before the plaintiff did. On February 8, 1908, the plaintiff's attorney tendered to the attorney of the defendant $911.20, and also tendered to its secretary and treasurer the same amount to pay the draft which the defendant had caused to be taken up. Both tenders were refused. The tender is continuous. The plaintiff prayed, "that the said defendant be required to disclose to your petitioner the numbers of the other two lots of land so drawn by your petitioner, and not known to your petitioner, which lots of land he is entitled to, and their location;" that the defendant be required to convey to plaintiff all the lots of land drawn by him (giving certain numbers), and also the other two lots at present not known to him; that defendant be required to pay the plaintiff reasonable rent for the lots, including improvements thereon, "with interest on the said $250 to improve one of the said lots of land; also whatever the amount of rent may be due on the two lots of land not known to your petitioner;" that the defendant be enjoined from selling or disposing of the lots, and for process. The plaintiff amended his petition by striking out from one of the paragraphs, which gave the numbers of the lots drawn by him, all the numbers except that of one lot, described as having a brick store located upon it. The amendment then proceeded as follows: "Plaintiff further amends his petition so as to ask specific performance from the defendant as to lot 14 in Block 104, being the brick store and lot: and plaintiff strikes from his petition all reference to all other lots mentioned in said petition. Plaintiff so amends his petition without prejudice as to

his rights and title to said lots so stricken." The defendant's demurrer was overruled, and this was assigned as error.

*Kelley & Smith* and *E. C. Collins*, for plaintiff in error.

*Hines & Jordan* and *W. T. Burkhalter*, contra.

LUMPKIN, J. (After stating the foregoing facts.)

The arrangement sought to be enforced was plainly a lottery scheme. The seller did not convey or contract to convey any particular lots or land to any certain purchasers. It received from proposed purchasers arbitrarily fixed amounts, without reference to the relative value of the lots into which it had divided its property. These varied very much in value. Whether a purchaser received lots of greater or less value for his money was not determined by contract but by chance. A drawing was had, by which names were put in one box and numbers in another, and upon the hazard of drawing out names and numbers depended the determination of what lots a proposed purchaser should get for his money. The drawing was conducted by a committee of the proposed purchasers under rules and regulations of the proposed seller. The plaintiff in the present case appears to have drawn the capital prize. He alleged that under his contract he was to pay a thousand dollars, for which he was to receive ten lots, and that one of them drawn by him was of the value of $3,000, while others were of considerable, though less, value. The mere use in the written contract of such euphonious expressions as that the "opening and distribution of these lots and land will be conducted on a plan entirely in keeping with the law, and fair to all, and shall be agreed upon by a majority of the purchasers present," will not serve to conceal the real illegality of the scheme. The seller did not sell a tract of land to tenants in common and leave them to divide it among themselves. It was to participate in the "opening," and did so. It was only to convey such lots as were drawn. The "opening" was to take place when ten applications were sold in one town. Disregarding any mere device of words, what was actually contracted for by each so-called purchaser was evidently a right to have a certain number of lots conveyed to him by the seller, to be determined by chance, the various lots being widely different in value. A lucky draw would result in obtaining valuable lots for the amount paid by the purchaser. An unlucky draw would give him lots of much less value for his payment. The plaintiff alleges, that, "after

the drawing was completed, and it cropped out that your petitioner had good luck," the defendant refused to convey to him the lots drawn on his behalf; that he was absent at the time the drawing took place, and the defendant would not even disclose to him what lots were drawn in his favor, but that he had ascertained several of them, one of them being a store lot valued at $3,000. In his original petition he prayed discovery in order to find some of the lots he claimed to be entitled to, and also specific performance in regard to them. By amendment he confined his prayer for specific performance to the particular lot mentioned. The plaintiff's own allegations show how far this was from a bona fide sale of land to him. Such schemes as this are illegal and will not be enforced. A court of equity will not decree specific performance of a promise to pay a capital prize in a lottery or gift enterprise. Penal Code, § 406; *Whitley* v. *McConnell,* 133 *Ga.* 738 (66 S. E. 933) ; Lynch *v.* Rosenthal, 144 Ind. 86 (42 N. E. 1103, 31 L. R. A. 835, 55 Am. St. R. 168) ; Guenther *v.* Dewein, 11 Iowa, 133; Wooden *v.* Shotwell, 24 N. J. L. 789; Allebach *v.* Godshalk, 116 Penn. 329 (9 Atl. 444) ; 19 Am. & Eng. Enc. Law, 591. The court erred in overruling the demurrer to the petition.

*Judgment reversed. All the Justices concur.*