5744.  TOWNSEND *v.* THE STATE.

ROAN, J.  1. In this State it is settled, by repeated decisions, that the failure of the trial judge to charge the jury in a criminal case to the effect that the defendant enters upon the trial with the presumption of innocence in his favor, and that this presumption remains with him until overcome by evidence sufficient to satisfy the jury of his guilt beyond a reasonable doubt, is reversible error.  The court in this case erred in failing to charge the jury to this effect.  See *Reddick* v. *State,* 11 *Ga. App.* 150 (74 S. E. 901) ; *Butts* v. *State,* 13 *Ga. App.* 274 (79 S. E. 87) ; *Thurman* v. *State,* ante, 543 (81 S. E. 796) ; Coffin *v.* U. S., 156 U. S. 432 (15 Sup. Ct. 394, 39 L. ed. 481).

2. The charge of the judge, construed as a whole, is free from reversible error, except in the omission referred to above.  *Judgment reversed.*
DECIDED JULY 7, 1914.

Accusation of carrying on a lottery, etc.; from city court of Richmond county—Judge W. F. Eve.  April 24, 1914.

The accusation was against H. G. Townsend and another person, and was in three counts, based respectively on sections 397, 398, and 401 of the Penal Code.  In the first count the defendants were charged with "the offense of a misdemeanor, carrying on a lottery, for that [they]  .  .  did, by themselves, servants, and agents, sell, offer for sale, procure, and furnish a ticket number combination and chance in a lottery and gift enterprise, contrary to the laws" of the State of Georgia.  The second count charged that the defendants "did, by themselves, servants, and agents, keep, maintain, and employ and carry on a lottery and other schemes and device for the hazarding of money and other valuable things."  The third count charged the advertising of a lottery, etc.  There was a general verdict of guilty against Townsend.  He excepted to the refusal of his motion for a new trial.

From the evidence it appeared that Townsend was engaged in a business conducted under the name of Home Furniture Company.  Rev. J. H. Stewart testified: "Mr. Bell came to my house and told my wife and myself that he was representing the Home Fur-

niture Company. He had a large catalogue with pictures of furniture which he was selling. He told my wife she could select any piece of furniture in the catalogue and have it for $12.50 by paying 50 cents down and 50 cents a week on the contract. He said that every Monday morning the managers drew out a name, and if her name was drawn she would get the furniture, regardless of the amount which might be already paid in, but, even though her name was not drawn, she would get the piece of furniture selected after the $12.50 had been paid. Mr. Townsend never came to my house. . ˙ . My wife joined the club hoping her name would be drawn and in that way she would get the furniture for less than $12.50." The witness identified a printed form of contract as the kind of contract signed by his wife. It described the Home Furniture Company as a "profit-sharing association," and contained the following agreement: "We promise to sell holder of this contract one . . couch ˙[described], or at the request of the contract holder the order will be changed to any article here listed and described for $12.50 cash in advance with order or at the preference of the contract holder, or installments at the rate of 50 cents every week. As a separate and special advantage to member holding this contract, who in return agrees to allow us to print her name as having received one or more of our advertising premiums, one $12.50 advertising premium will be placed at less than cost every week in each section to advertise the business, and the lady who receives this $12.50 premium will be given a clear receipt, no matter what amount she has paid. Recipients of advertising premiums will be selected by the management to advertise the business, this method being used instead of paying money to newspapers. The holder of this contract can also purchase in the profit-sharing department four $12.50 articles of furniture, as here listed, for $6.50 each and a coupon. Coupons can be purchased from district managers and collectors, and will be given free by local. merchants. . . No lottery methods of any kind enter into this contract, and we do not authorize agents to make statements or arrangements, verbal or in writing, either to add, change, erase, infer, or specify terms contrary to this contract, and contract holder promises not to enter into any arrangements contrary to contract with agents; any such arrangements will not be recognized by us, due notice being hereby given in advance. . . We print on our leaflets

names of customers when entitled to furniture in all departments."
The contract contained a printed list of furniture and of other ar-
ticles, headed "List of $12.50 premiums." The State introduced
in evidence a printed circular or poster of the Home Furniture
Company, containing a list headed "Customers who received fur-
niture," and the following statement: "We print on this slip
names of all customers who are to receive furniture in the profit-
sharing advertising and other departments, irrespective of amount
paid for same. Names printed are to receive discounts from our
regular prices for advertising purposes, with the understanding that
they are to show the furniture received to their friends and neigh-
bors; this being our method of displaying furniture in towns where
we have no display rooms."

Guy Sturgis testified: "Mrs. Sturgis joined the Home Furni-
ture Company. I was present once or twice when the collectors
came around. . . I asked the young fellow what kind of busi-
ness they were in, and they told me they were forming clubs of 25 or
50 cents apiece, and each week there was a drawing and somebody got
furniture for 50 cents. Some of them had to pay $1. If you stayed
in the club for 25 weeks you would be entitled to it, and if you
were a lucky member you were liable to get it from 50 cents to
$12.50, depending upon whether you were drawn out or not. I
heard the proposition once since the first time at home from a col-
lector of the company. I think it was the defendant; I would not
be positive about it; it looked very much like him. . . I do not
recall whether the defendant is the man who came to my house or
not." In rebuttal of the defendant's statement to the court and
jury, this witness testified: "He [the defendant] made a state-
ment at my house that they had drawings. I am now prepared to
say he is the man." H. G. Carswell testified for the defendant:
"I was employed by the Home Furniture Company as solicitor. I
sold furniture for them at $12.50. In addition to this a customer
would be selected each week by the management to advertise our
goods. In consideration of the party allowing the company to use
their name for advertising purposes, and also to show the goods to
whoever might call to see them, they would sell a piece of furniture
to them at a reduced rate; the furniture sold in this way to be
different from the piece purchased on contract. I have been at the
office on Monday mornings and have never seen any drawings. I

always told parties joining the club that the managers would select some one each week to advertise goods, and that they might be selected. I would show purchasers this paper" (a circular referring to the weekly distribution of "advertising premiums"). The defendant, in his statement, denied that there was any drawings in the business referred to, and said: "We select some member of a club each week who will make a good advertisement for us, and let them select any article we have, which we sell to them at a greatly reduced price; we put the furniture in their house, and people go there to see it. We also use their name in our advertising sheet. . . I collected several times at Mr. Sturgis's house, but I did not see Mr. Sturgis and never made any statement to him. . . We give our agents positive instructions to make no other representations than those on our contract."

1. In the motion for a new trial it was alleged that the court erred "in failing to charge the jury that the defendant entered into the trial of the case with a presumption of innocence in his favor." The court charged the jury that it was their duty to acquit the accused if they had a reasonable doubt as to his guilt. In the brief of counsel for the State it was contended that the instructions as to the burden on the State, to establish the guilt of the accused beyond a reasonable doubt, were equivalent to an instruction that he was presumed to be innocent; and the case of *Webb* v. *State,* 11 *Ga. App.* 850, was cited on this point.

2. It was alleged that the court erred in the following instructions to the jury: (*a*) "The lottery or scheme or device—the law does not define how they are constituted, but says that anything is a lottery, scheme, or device for the hazarding of money, where there is a consideration, a chance, and a prize." (*b*) "If you are satisfied, under the evidence submitted to you, that this defendant had a scheme by which a party was induced to join a club, pay so much per week, and at the end of the week was to receive a certain article of a certain value, and in addition to that he was to have a chance to be selected as one to receive an additional premium or prize, and that a consideration was paid for that, then he would be guilty of the second count, and you should return a verdict of guilty under that count." (*c*) "The mere fact that the contract or scheme gave to the party the value in goods or articles of the amount paid, yet if there was an additional inducement or prize that was to be de-

termined by chance or selection, then he would be guilty of violating this law." (d) "A merchant or citizen engaged in selling any article or class of goods has a right to give with each purchase something additional in the way of an inducement to trade. That would not be a violation of the law, because there would be no hazard or chance; but where the contract is that the party may or may not receive this additional one, and it depends upon a chance, either of drawing or selection, then the crime is complete and the duty of the jury would be to return a verdict of guilty." (e) "Where he makes a contract of sale and couples it with a prize which is to be determined by chance among a number of purchasers, then it becomes a prize and a violation of the law prohibiting the carrying on of a lottery or any other scheme or device for the hazarding of money."

It was contended that these instructions were misleading because the use of the word "chance," without qualification, conveyed the idea of lot or hazard, and excluded the idea of chance in the sense of opportunity, possibility, probability, or happening, based or dependent on the business discretion of the managers in selecting a person to advertise their goods, whose reputation, position, or location would be best suited for that purpose. It was contended that the use of the word "selection" was misleading for the same reason, and because it excluded the idea of being selected to perform some duty for which an additional and independent consideration was required from the person selected.

As to what constitutes a "lottery," counsel for the plaintiff in error cited: 2 Bouv. Law Dict., title "Lottery;" 74 Mich. 264 (41 N. W. 916); 154 N. C. 616 (70 S. E. 388); 56 N. Y. 424; 66 Am. Dec. 724; 30 Am. R. 266; 16 Am. St. R. 39; 7 N. Y. 228; 59 Ill. 160; 58 Fed. 942; 137 Ala. 101 (34 South. 1018); 117 *Ga.* 599; 1 Am. & Eng. Annot. Cas. 88. Cited for the State: 121 *Ga.* 593; 117 *Ga.* 600 (14); 129 *Ga.* 160; 69 *Ga.* 54 (1).

*George T. Jackson, William D. Irvin, John J. Foster, W. Inman Curry,* for plaintiff in error.

*James C. C. Black Jr., solicitor,* contra.