### 26363. BARKER v. THE STATE.

DECIDED NOVEMBER 11, 1937.

Leonard Farkas, Walter H. Burt, for plaintiff in error.

M. B. Peacock, solicitor, contra.

MACINTYRE, J. The defendant was charged with a misdemeanor, in the following accusation: "I, M. B. Peacock, Solicitor of the City Court of Albany, Georgia, in the name and behalf of the citizens of Georgia, charge and accuse Frank Barker with the offense of conducting a lottery or gift enterprise, a misdemeanor; for that said defendant did, on the 16th day of September, 1936, in the county aforesaid, unlawfully, and with force and arms, then and there conduct a prize plan as follows: The plan was known as 'Bank Night.' In the operation of this plan the defendant did on the day in question cause a drawing to be held on the stage of the theater which he supervised, managed, and controlled, and did distribute and pay to the person entitled under the 'Bank Night' plan a prize of a sum of money. Defendant had advised the public generally of the operation of this 'Bank Night' plan, and had operated it in the following manner: The public in general was invited to register in a book, which book was kept at defendant's theater in a position outside the box-office. Registration consisted of signing the name of the individual registering in this book. Defendant required no payment of any money or other thing of value for the privilege of registering in the said book; nor did defendant require the purchase of a ticket to the theater as a condition for such registration; and defendant required nothing of any person registering, except that a registrant sign his name in said book. After the names were entered in the registration book, a number was assigned to each name, and each number so assigned was also placed on a card. The cards so numbered were placed in a container, and a single card was, on each night of the drawing, removed from the container by lot. On the night in question it was advertised to the public that a drawing for a prize on the stage of the defendant's theater would be had, at which a numbered card representing the name of some person who had voluntarily registered in the registration book would be drawn by

chance, that the name of the person whose number was drawn would be announced both within and without the theater. The person whose name was called had the privilege of coming into the theater and on the stage, and on proper identification of himself was entitled to enter the theater free of charge, without the purchase of an admission ticket, for the purpose of presenting himself on the stage and identifying himself. The defendant further conditioned the gift of the prize money on the appearance of the person whose name was drawn within a reasonable time after the name had been announced. The defendant had announced that a reasonable time was three minutes from the moment the name of the winner was called outside the theater, which period was a sufficient time for any person standing outside the theater to enter and present himself on the stage. In the event that the person whose name was called on any occasion should fail to appear and identify himself and claim the prize within the said three-minute period, the said prize was allowed to accumulate and to become a part of the prize to be given away at the time of the next succeeding drawing. Defendant did on the night in question have a drawing as provided by the said 'Bank Night' plan, and did on the night in question give away the prize money to the individual whose number was drawn and who presented himself in accordance with the said plan."

The defendant filed a demurrer on the grounds: (1) That the accusation does not set out any offense under the laws of the State of Georgia. (2) That it shows on its face that the defendant is not guilty of the offense of conducting a lottery or gift enterprise or any other scheme or device prohibited by law. (3) That it shows on its face that the plan which this defendant was charged with conducting did not cause or permit the "hazarding of money or other valuable thing," which is a necessary and an essential ingredient of the offense charged. The demurrer was overruled, and the defendant excepted.

Generally speaking, and under the oldest enacted statute with reference to lotteries, which appears in the Code, § 26-6502, there must be in a lottery a union of three elements—consideration, chance, and prize; and where a gift enterprise lacked a consideration which is one of the essential elements, it is not a lottery, except where the necessity of said element has been eliminated by

a statute. 38 C. J. 297, § 17. Article 9 of division 10 of the Penal Code of 1910 (now codified as chapter 26 of the Code of 1933) dealt with lotteries, and various sections were placed therein, undertaking to deal with various forms of lotteries or schemes which were made criminal. The first codified statute in this chapter on lotteries is section 26-6502 of the Code of 1933, as follows: "Any person who, by himself or another, shall keep, maintain, employ, or carry on any lottery or other scheme or device for the hazarding of any money or valuable thing, shall be guilty of a misdemeanor." The next oldest is section 26-6501, as follows: "Any person who, either by himself or his agent, shall sell or offer for sale, or procure for or furnish to any person any ticket, number, combination, or chance, or anything representing a chance, in any lottery, gift enterprise, or other similar scheme or device, whether such lottery, gift enterprise, or scheme shall be operated in this State or not, shall be guilty of a misdemeanor." These two statutes as thus codified "are directed against lotteries, gift enterprises, or other similar schemes. In a lottery there must be union of the three elements, consideration, chance, and prize. *Equitable Loan & Security Co.* v. *Waring,* 117 *Ga.* 599 (44 S. E. 320, 62 L. R. A. 93, 97 Am. St. R. 177). A 'gift enterprise' is a sporting artifice by which, for example, a merchant or tradesman sells his wares for their market value, but by way of inducement gives to each purchaser a ticket which entitles him to a chance to win certain prizes, to be determined after the manner of a lottery. See *Meyer* v. *State,* 112 *Ga.* 23 (37 S. E. 96, 51 L. R. A. 496, 81 Am. St. R. 17). As the gift enterprise contemplates lottery, and lottery involves chance, it follows that the element of chance is an essential of a gift enterprise. The expression 'similar scheme,' as used in these statutes, necessarily refers to schemes like lotteries or gift enterprises; and consequently the element of chance is essential to their existence. . . As 'chance' is an essential element in either a 'lottery,' 'gift enterprise,' or 'other similar scheme,' it is proper to inquire, what is chance as contemplated in these statutes? The chance here referred to is that chance which is employed in connection with lottery schemes, where the attempt is to attain certain ends, not by skill or any known or fixed rules, but by the happening of a subsequent event, incapable of ascertainment or accomplishment by means of human

foresight or ingenuity." *Russell* v. *Equitable Loan & Security Co.,* 129 *Ga.* 154, 161 (58 S. E. 881, 12 Ann. Cas. 129). In Commonwealth *v.* Wall (Mass.), 3 N. E. (2d) 28, the essential facts were practically the same as in the instant case. The court said, "We are also of the opinion that the prize [one of the essential elements in lottery] must come from the participants in the game, in part at least, as payment for their chances, and that the indirect advantage of the theater of large attendance is not in itself a price paid by the participants." But it might be added that the larger attendance might be a fact or circumstance from which the jury could infer that unusual crowds which filled the theater paid to come in partly because they had, or reasonably believed, that they had a better chance to win than if they stayed outside, and that they paid their money in part for that better chance. In Commonwealth *v.* Wall, supra, the court further said: "A game does not cease to be a lottery because some, or even many, of the players are admitted to play free, so long as others continue to pay for their chances. . . The test is not whether it were possible to win without paying for admission to the theater. The test is whether that group who did pay for admission were paying in part for the chance of a prize. They [the jurors] could take a realistic view of the situation. They were not obliged to believe that all the ingenious devices designed to legalize this particular game of chance were fully effective in practical operation. An important feature of the plan was the necessity that the person whose number was drawn should appear at once and claim the deposit. The time allowed for appearance was entirely within the control of the defendant. No definite time seems to have been fixed. A participant inside the theater would have the advantage of immediate presence in a place of comfort. He could hear the number and the name read. He could identify himself at once. A participant outside the theater must wait in discomfort, in the hope that if his name should be drawn within he would be notified and would hear the call soon enough to crowd through toward the front of the theater within such time as might be allowed. The object of the defendant was to fill the theater, not the lobby or the sidewalk. We think the jury could find that the unusual crowds which completely filled the theater on 'Bank Night' paid to come in partly because they had, or reasonably believed they

had, a better chance to win the prize than if they had stayed outside, that they paid their money in part for that better chance, and that the scheme in actual operation was a lottery." Also, in City of Wink *v.* Griffith Amusement Co., supra, the facts were essentially the same as in the case at bar; and the Texas Supreme Court said: "There were two different classes of possible prize winners, namely, the holders of free registration numbers, who chose to remain outside of the theater, where neither the show nor the paraphernalia and actual operation of the drawing could be seen, and those who, at least on 'Bank Night' paid the consideration required at the door, entered the theater, and saw the show, including the paraphernalia to be used in the drawing, and the actual drawing itself while comfortably seated close at hand so that they might hear without fail the announcement of the winner and be present to claim the prize, each privilege a concomitant part of the entire scheme. It is idle to say, as to those who entered the theater and enjoyed the privileges named, that the admission charge was not both for the show and the pleasure and advantage stated above and the prize emolument of the drawing. This admission charge is inseparable from the privileges enumerated, which were materially different from the privilege of those who remained outside of the theater holding the so-called 'free' registration numbers. It is idle to say that the payment made for seeing the picture is not, in part at least, a charge for the drawing and the chance given. The things to be seen and done in the theater, and the privileges above enumerated which accompanied them, are all a part of one and the same show, meaning the entire proceedings inside the theater. The fact that part of the things to be enjoyed by those who paid at the door were classed as 'free' by the defendant in error, does not change the legal effect of the transaction, or what was actually done by defendant in error, namely, for the price of admission to grant the patron not only the opportunity to see and hear the picture, but to see and hear and enjoy the habiliments of the 'Bank Night,' drawing, etc., detailed above. We are unable to see in what manner the giving of free registration numbers to those outside of the theater would change the legal effect of what was done inside the theater, for which a charge was made; nor does the fact that a claimant's right to the prize was evidenced by a registration book instead of

a ticket, as it is usual in lotteries, change the legal result. The registration numbers represented 'chances' at the prize just as effectively as would tickets to the drawing." If the scheme in the instant case had been to allow only those who bought tickets and entered the theater to observe the performance and the drawing of the number by lot, and be present to claim the prize, there could be no question that it would have been a lottery. *Jorman* v. *State,* 54 *Ga. App.* 738, 741 (188 S. E. 925). But here all were allowed to register who presented themselves at the box-office; and when the name of the winner, who had to be registered, was later drawn from the container on the stage, it was announced in the theater and also on the outside; and the winner, if on the outside, could enter the theater without cost and obtain the prize if he did so within three minutes. While it may be said that there were two different classes of possible prize winners, the holders of free registration and those who paid at the door and received a registration number plus a ticket, or a ticket plus a registration number, yet these two classes formed a group or entity whose sphere was restricted to the registrants, and the members of this group of registrants were the only players or participants in the game or scheme. Who obtained chances to play? Only the members of this group, the registrants. Who paid for all of the chances? All of the chances were paid for by the group composed of two subdivisions—those who purchased tickets and registered and those who registered only. "If in the flourishing days of the Louisiana lottery its management had advertised that it would give free tickets to the president of every bank in the City of New Orleans, that would not have changed the scheme from a lottery, whether or not any one or all of such free tickets were accepted." State *v.* Danz, 140 Wash. 546 (250 Pac. 37). If the proprietor's hope and intention in allowing the registration was that the persons registering might be induced to purchase tickets and enter the theater to observe the performance and the operation of drawing the number by lot, and be present to claim the prize, the mischief is really the same in the present case as if only those who actually bought tickets and entered were allowed to claim the prize; for an inducement is held out to the same class of people to purchase tickets, to wit, all of those who register. In the instant case all chances are paid for in mass by the general

body of purchasers of tickets, although an individual registrant may not pay for his chance. Therefore the theater which distributes the chances is paid if the sale of tickets be looked at as a whole, although some chances are given away. Wills v. Young, L. R. K. B. D. 1907, 1, 448. In the present instance all chances are paid for in bulk by the general body of purchasers of tickets. Although an individual purchaser may or may not pay for his chance, yet one of these purchasers, whether he has paid for his ticket himself or whether his ticket is paid for by any other individual, or whether his ticket is paid for collectively by his entire group, can not participate in the prize contest unless he has registered, and a number assigned to him is placed on a card and the card so numbered is placed in the container on the stage to be removed by lot.

If it be granted that the plan of the defendant was not a lottery under § 26-6502, because a charge was not made for the registration entitling one to participate in the drawing, then it clearly comes within the condemnatory terms of § 26-6501, because it is condemnatory of a "gift enterprise," which is such an enterprise as where the theater by way of inducement allows each purchaser to register and assigns to each registrant purchaser a ticket which entitles him to win a prize which is determined by lot or by the drawing of a number from a container on the stage, the determination thus being made after the manner of a lottery, notwithstanding the theater sells its entrance tickets at the market value or regular price unchanged because of it being "Bank Night." *Russell* v. *Equitable Loan & Security Co.,* supra. There seems to be a diversity of opinion among the courts as to whether facts similar to the ones alleged in the instant case, under the various statutes in the several States, constitute a lottery. "Such practice" as distributing money at moving-picture theaters on Bank Night "has been denounced in more than one theatrical magazine, and showmen have denounced the screen lottery. There is good reason to support the oft-expressed view of our best-informed citizens that the practice in question is detrimental to show houses themselves, as well as hurtful to the public morals. No doubt many of the most faithful patrons of the pictures are anxious to see the fad pass and the houses devoted to their proper function of wholesome entertainment." State ex rel. Atty.-Gen. v. Crescent Amuse-

ment Co., 172 Tenn. 351 (95 S. W. (2d) 313). Under our statutes, we feel authorized to declare that the allegations of the accusation in this case set forth a criminal offense, and that it was not subject to the demurrer. *Jorman* v. *State,* supra. The gravamen of the offense charged is not necessarily in the wrongful intent of the theater, but in the baneful effect upon the public.

*Judgment affirmed. Broyles, C. J., and Guerry, J., concur.*