42683.   BOYD v. PIGGLY WIGGLY SOUTHERN, INC.

ARGUED APRIL 3, 1967—DECIDED APRIL 24, 1967.

*L. H. Hilton,* for appellant.

*Duncan Graham, William T. Darby, W. Colbert Hawkins,* for appellees.

EBERHARDT, Judge. "The first task facing a contestant seeking to enforce rights allegedly acquired in a prize-winning contest, in a court of law or equity, is that of showing that the contest scheme was legal, for courts uniformly refuse to lend their aid in the enforcement of an illegal agreement." Annot., Private Rights and Remedies Growing Out of Prize-Winning Contests, 87 ALR2d 649, 652, § 2 (1963). Our courts have uniformly refused to lend their aid in either law or equity to enforce contracts between promoters and participants, or to settle disputes between competing participants, where the contracts or disputes are grounded in lotteries or gift enterprises which are illegal and contrary to public policy. *Whitley v. McConnell,* 133 Ga. 738 (66 SE 933, 27 LRA (NS) 287, 134 ASR 223); *Glennville Investment Co. v. Grace,* 134 Ga. 572 (68 SE 301, 29 LRA (NS) 758); *Garland v. Isbell,* 139 Ga. 34 (76 SE 591); *Standridge v. Williford-Burns-Rice Co.,* 148 Ga. 283 (96 SE 498); *Bloodworth v. Gay,* 213 Ga. 51 (96 SE2d 602); *Dennis v. Weaver,* 103 Ga. App. 824 (121 SE2d 190), aff'd. 217 Ga. 448 (122 SE2d 571).

Our Constitution declares: "All lotteries, and the sale of lottery tickets, are hereby prohibited; and this prohibition shall be enforced by penal laws." Constitution of 1945, Art. I, Sec. II, Par. IV (*Code Ann.* § 2-204). The penal statutes provide: "Any person who, either by himself or his agent, shall sell or offer for sale, or procure for or furnish to any person any ticket, number, combination, or chance, or anything representing a chance, in any lottery, gift enterprise, or other similar scheme or device, whether such lottery, gift enterprise, or scheme shall be operated in this State or not, shall be guilty of a misdemeanor." *Code* § 26-6501. "Any person who, by himself or another, shall keep, maintain, employ, or carry on any lottery or other

scheme or device for the hazarding of any money or valuable thing, shall be guilty of a misdemeanor." *Code* § 26-6502.[1]

Under these statutes it is settled in Georgia, and in virtually all jurisdictions under varying statutes, that three ingredients are necessary to constitute a lottery or gift enterprise—prize, chance, and consideration. *Equitable Loan &c. Co. v. Waring*, 117 Ga. 599 (14) (44 SE 320, 62 LRA 93, 97 ASR 177); *Russell v. Equitable Loan &c. Co.*, 129 Ga. 154 (58 SE 881, 12 AC 129); *Barker v. State*, 56 Ga. App. 705 (1) (193 SE 605); *Heath Sales Co. v. Bloodworth*, 221 Ga. 567, 569 (146 SE2d 275). Plaintiff acknowledges that prize and consideration are present in the sales promotion scheme under consideration, but contends that chance is not. Defendant contends that consideration is not present so as to support a suit upon the alleged winning ticket; but, if consideration is present, then a lottery or gift enterprise is shown because prize and chance also appear.

The basis of plaintiff's contention of "no chance" is an assertion that the record shows that the defendant's televised programs of horse races are based upon moving picture films of horse races which were run months and years before each televised program, and, in advance of the distributing of the tickets or the showing of the films, the winning horse of each race thus televised is well known by the defendant, the public at large and is a matter of record. Assuming for the purpose of argument that the record shows this to be so, and also that it was generally known which particular races would be shown in the programs for any given week, the point which is overlooked is that the record conclusively shows that the recipients of the winning tickets were determined purely by chance. The point is aptly illustrated in defendant's brief, where the following hypothetical question is posed: suppose in a drawing for a prize the names of the presidents of the United States were put on tickets and placed in a hat, the person drawing the name of the first president of the United States to win the prize. Certainly the winner of the prize would be determined by chance

---

[1] *Code* § 26-6502, when construed with § 26-6501, is not so vague and indefinite that it is incapable of enforcement and deprives one of due process of law. *Heath Sales Co. v. Bloodworth*, 221 Ga. 567 (1) (146 SE2d 275).

even though the fact that George Washington was the first president is more widely known than the winners of the horse races. The point needs no further discussion.

The question upon which this case turns, as have practically all of the cases involving similar sales promotion schemes, is that of consideration. *Jorman v. State,* 54 Ga. App. 738 (188 SE 925) and *Barker v. State,* 56 Ga. App. 705 (193 SE 605) are our leading cases on the "flexible participation" gift enterprise schemes—that is, those in which a purchase is not a condition precedent to participation in the scheme whereby a prize is awarded by chance. These cases, while somewhat factually different from the case at bar since they involve "bank night" at motion picture theaters, are controlling in principle and dictate our holding that defendant's "Pot O'Gold Derby" is illegal and contrary to public policy, barring a recovery; and were it not for the fact that *Dumas v. Todd,* 93 Ga. App. 540 (92 SE2d 265) appears in the books, we would conclude this opinion without further discussion of the point. In *Dumas* the court apparently felt that *Jorman* and *Barker* were distinguishable; but since we feel that any distinction is at best questionable, we have re-examined these cases in the light of the unbroken line of "closed participation" cases in our own courts, beginning with *Meyer v. State,* infra, as well as secondary authorities and scores of opinions from other jurisdictions dealing with "flexible participation" lotteries and gift enterprises. We have concluded that *Jorman* and *Barker* were correctly decided on the basis of a pecuniary consideration flowing to the promoters of the schemes and must be followed; and, if *Dumas* requires a different result in regard to this basis, it will not be followed. Under this view it is not necessary for us to decide whether *Dumas* must be over-ruled altogether on the theory that any consideration, whether pecuniary or not, which would support a simple contract, such as a detriment to the promisee or a benefit to the promisor, would also establish consideration as an essential ingredient of a lottery. We might observe, however, that there is a substantial body of law espousing this doctrine. We will not deal with secondary authorities since we deem it sufficient to trace the course of anti-lottery decisions in our own courts.

It is well-settled in Georgia that a "closed participation" gift

enterprise scheme—that is, one which is open only to patrons purchasing goods, services, or whatever the promoter is trying to push by the scheme—is illegal and contrary to public policy. *Meyer v. State,* 112 Ga. 20 (37 SE 96, 51 LRA 496, 81 ASR 17); *DeFlorin v. State,* 121 Ga. 593 (49 SE 699, 104 ASR 177); *Whitley v. McConnell,* 133 Ga. 738, supra; *Standridge v. Williford-Burns-Rice Co.,* 148 Ga. 283, supra; *Jenner v. State,* 173 Ga. 86 (159 SE 564); *Bloodworth v. Gay,* 213 Ga. 51, supra; *Alexander v. City of Atlanta,* 13 Ga. App. 354 (179 SE 177); *Townsend v. State,* 14 Ga. App. 757 (82 SE 253); *Brockett v. State,* 33 Ga. App. 57 (125 SE 513); *Dennis v. Weaver,* 103 Ga. App. 824, supra.

The principle is succinctly stated in the headnote to the leading case, *Meyer v. State,* 112 Ga. 20, supra: "A merchant who gives to a designated class of customers an opportunity to secure by lot or chance any article of value additional to that for which such customers have paid violates the provisions of Section 407 of the Penal Code, which declares that no person 'shall keep, maintain, employ, or carry on any lottery in this State, or other scheme or device for the hazarding of any money or valuable thing.'" In that case the accused was a wholesale and retail dealer in cigars and chewing gum and operated a " nickel slot trade machine" in his place of business. The customer depositing a nickel in the machine was entitled in any event to a cigar or pack of gum valued at five cents and in addition the possibility of a prize as determined by the machine by chance. Many customers purchased the same cigar or pack of gum over the counter for a nickel, while others purchased through the operation of the machine and took the chance of getting more than the value of their money. It was held that the defendant, if not guilty of operating a lottery, was guilty of maintaining a scheme or device of a similar nature. The Supreme Court rejected the contention that there was no lottery since the customer risked nothing, getting his money's worth in any event, quoting with approval from other decisions which state that the customers pay their money, at least in part, for the chance of winning a prize, and that these artifices to evade and cheat the law, and entrap the unwary, are but aggravations of the offense.

*Alexander v. City of Atlanta,* 13 Ga. App. 354, supra, involved

facts virtually identical with those in *Meyer v. State,* 112 Ga. 20, supra, the court holding them to show the defendant to be guilty of keeping a gaming house. As was stated in that case (p. 355): "It may be true that the player receives the value of the money he deposits in the slot, but he stands a chance to get twenty times its value, and it is the pressure of this chance that continues the progress of the game and makes it a game of chance." The ultimate holding in that case was that a city ordinance, making it unlawful for any person to carry on any business by means of any wheel or similar device in which the elements of chance are used for the purpose of attracting trade, was void, since this offense was fully covered by the general statute forbidding the keeping of a gaming house by any person. *Jenner v. State,* supra, was decided upon facts identical to *Meyer* and *Alexander,* supra, except that the customer, in addition to getting a five-cent pack of mints for a nickel, stood to win "a horoscopic message or pretended fortune" rather than cigars, packs of gum, or beer as in previous cases. It was held that defendant was guilty of maintaining a "lottery or other scheme or device for the hazarding of any money or valuable thing."

In *Brockett v. State,* 33 Ga. App. 57, supra, we see an ingenious, and albeit ingenuous, subterfuge to escape the effect of *Meyer* and *Alexander.* In that case the customer deposited a nickel in the machine and received for his nickel a five-cent pack of mints or gum. After each operation the machine would indicate whether on the *next operation* the customer would receive, in addition to the gum or mints, "premium checks" which could be traded for merchandise or redeposited in the machine. Thus as to the present operation, no chance was involved since the customer would always know in advance whether he would receive a certain quantity of "premium checks" in addition to the gum or mints, but he would not know what he would receive on the succeeding operation until the completion of the present one. This subterfuge failed, and *Meyer* and *Alexander* were followed.

In *Standridge v. Williford-Burns-Rice Co.,* 148 Ga. 283, supra, chances on a drawing for an automobile were given out by a merchant in proportion to the amount of cash paid for purchases at the merchant's store, and this scheme was held to be a gift

enterprise in violation of the statutes and contrary to public policy. In *Bloodworth v. Gay*, 213 Ga. 51, supra, it was alleged that a tobacco warehouse, chamber of commerce, and retail merchants association proposed to give an automobile to some person who sold tobacco through the warehouse and that the chances on the automobile were given to the sellers in proportion to the sale price. It was held that the petition revealed a gift-enterprise scheme which was contrary to public policy. In *Dennis v. Weaver*, 103 Ga. App. 824, supra, chances on an automobile were distributed to customers of a service station who bought gas, and it was held that this scheme was a lottery or gift enterprise against the laws and public policy of this state. And in *Whitley v. McConnell*, 133 Ga. 738, supra, it was held that a scheme whereby purchasers of lots at an auction were given chances on another lot was a scheme in the nature of a lottery. As Judge Lumpkin stated in the course of the opinion: "Enticing offers of this kind are unfortunately not uncommon in the effort to attract trade or make sales. But they are illegal. That a lottery or gift enterprise scheme is added to legitimate business to draw customers or buyers by appealing to the hope of securing something by chance, beyond the article actually bought, does not sanctify such an appeal to the gambling disposition so common in human nature, or make the agreement lawful. . . The scheme of the sale was to induce purchasers to bid, by means of the hope on the part of each that, in addition to the lot which he actually bought, he might get a prize—another lot—as a result of chance at a drawing. This was a scheme in the nature of a lottery, and could not be enforced by decree for specific performance, or by a judgment for the recovery of the land by a purchaser of another lot. It is immaterial that there was but one lot actually sold, and that the owner, having started the next lot and having failed to get another bid, withdrew it. If all had been sold, the scheme would have been illegal. It was not made legal because only one lot was sold."

Another form of the "closed participation" gift enterprise scheme appears in the "suit club" arrangement whereby the members of the club pay to the tailor one dollar per week, entitling each member to a chance in weekly drawings in which a thirty-dollar suit of clothes is awarded to the winner who

then drops out of the club, his place then being taken by a new member. In *DeFlorin v. State*, 121 Ga. 593, supra, this scheme was held to be a lottery notwithstanding the fact that each member who continued to pay his dollar for thirty weeks was, in any event, entitled to a thirty-dollar suit of clothes, regardless of the result of the drawings. *Townsend v. State*, 14 Ga. App. 757, supra, reached the same result concerning a furniture club.

With this line of authority firmly established as the law of this state, the "flexible participation" scheme then made its appearance in our courts in *Jorman v. State*, 54 Ga. App. 738, and *Barker v. State*, 56 Ga. App. 705, supra. In this type of scheme the promoters hoped to accomplish exactly what they had hoped to accomplish in the "closed participation" scheme—that is, promotion of their businesses by awarding prizes by chance—but they hoped to frame the rules of their programs so that the *rules themselves*, rather than the practical operation of the scheme, would be taken as the determinative criteria by the courts so that the anti-lottery statutes and decisions would be evaded. The device employed in this type of scheme is the "no purchase necessary" artifice which failed utterly in *Jorman* and *Barker*, the court in *Jorman* quoting from the opinion of Judge Lumpkin in *Equitable Loan &c. Co. v. Waring*, 117 Ga. 599, 615, supra, as follows: " 'As fast as statutes are passed, or decisions made, some skilful change is devised in the plan of operations, in the hope of getting just beyond the statutory prohibition; but so long as the inherent evil remains, it matters not how the special facts may be shifted, the scheme is still unlawful.' "

Both *Jorman* and *Barker* involved "bank night" at motion picture theaters, and the accusation in *Barker* succinctly describes the operation of this type of scheme (p. 706):

"The public in general was invited to register in a book, which book was kept at defendant's theater in a position outside the box office. Registration consisted of signing the name of the individual registering in this book. Defendant required no payment of any money or other thing of value for the privilege of registering in the said book; nor did defendant require the purchase of a ticket to the theater as a condition for such registration; and defendant required nothing of any person registering, except that a registrant sign his name in said book. . . On the

night in question it was advertised to the public that a drawing for a prize on the stage of the defendant's theater would be had, at which a numbered card representing the name of some person who had voluntarily registered in the registration book would be drawn by chance, that the name of the person whose number was drawn would be announced both within and without the theater. The person whose name was called had the privilege of coming into the theater and on the stage, and on proper identification of himself was entitled to enter the theater free of charge, without the purchase of an admission ticket, for the purpose of presenting himself on the stage and identifying himself. The defendant further conditioned the gift of the prize money on the appearance of the person whose name was drawn within a reasonable time after the name had been announced."

The scheme in *Jorman* was similar to that of *Barker* just set out, with the additional fact that persons representing the defendant went over the city with a registration book and got 2,800 people to register their names without charge. So in *Jorman*, the first "flexible participation" case in our courts, the contention was made that since there was evidence to the effect that "bank-night" patrons were entitled to a chance whether they bought theater tickets or not, no consideration was shown by the evidence.

The first headnote to that case states the principle of *Meyer* and the succeeding cases, supra: "A motion-picture show operator who gives to his customers, in addition to the admission to the show, opportunity to draw by lot or chance a prize of money or property, is guilty of conducting a lottery. Mutuality of risk is not necessary to constitute a lottery. The purchaser of the ticket may get value received and the whole risk be assumed by the operator."

The second headnote disposes of the "no-consideration" contention: "When the general scheme of such drawing is that only those who have purchased tickets participate therein and are entitled to win the prize, such scheme does not lose its identity as a lottery because some may participate in the drawing who have not bought tickets." The qualifying language contained in this headnote prior to the comma was prompted by the fact that, as observed by the court (p. 741): "It so happens that

all the witnesses in the case who held winning numbers testified that they had to buy tickets to be eligible for the drawing, and the defendant's witnesses who were helpers in the show testified that they had never seen anyone win except those who had purchased tickets." The court observed, however, that this could not "alter the fact that the operator may have given free chances to some without the purchase of tickets; even so, the lottery scheme as to a gift enterprise was present to all the rest, and this fact did not prevent it from being a lottery under the law of Georgia."

In *Barker* this court fully developed the rationale of consideration applicable to "flexible participation" schemes and affirmed the overruling of a demurrer to the accusation set forth above, holding that the described scheme was, if not a lottery under *Code* § 26-6502, at least a "gift enterprise" within the meaning of *Code* § 26-6501, notwithstanding the fact that the holder of the winning ticket standing outside the theater had not paid or bought a ticket of admission to the theater as a condition precedent to participation in the scheme, for the reason that the registrant card-holders as a body, some of whom purchased tickets of admission to the theater, collectively paid the theater for the chances distributed, although some were given away.

As we stated there (p. 711): "While it may be said that there were two different classes of possible prize winners, the holders of free registration and those who paid at the door and received a registration number plus a ticket, or a ticket plus a registration number, yet these two classes formed a group or entity whose sphere was restricted to the registrants, and the members of this group of registrants were the only players or participants in the game or scheme. Who obtained chances to play? Only the members of this group, the registrants. Who paid for all of the chances? All the chances were paid for by the group composed of two subdivisions—those who purchased tickets and registered and those who registered only. . . If the proprietor's hope and intention in allowing the registration was that the persons registering might be induced to purchase tickets and enter the theater to observe the performance and the operation of drawing the number by lot, and be present to claim the prize, the mis-

chief is really the same in the present case as if only those who actually bought tickets and entered were allowed to claim the prize; for an inducement is held out to the same class of people to purchase tickets, to wit, all of those who register. In the instant case all chances are paid for in mass by the general body of purchasers of tickets, although an individual registrant may not pay for his chance. Therefore the theater which distributes the chances is paid if the sale of tickets be looked at as a whole, although some chances are given away. [Citation]. In the present instance all chances are paid for in bulk by the general body of purchasers of tickets. Although an individual purchaser may or may not pay for his chance, yet one of these purchasers, whether he has paid for his ticket himself or whether his ticket is paid for by any other individual, or whether his ticket is paid for collectively by his entire group, can not participate in the prize contest unless he has registered, and a number assigned to him is placed on a card and the card so numbered is placed in the container on the stage to be removed by lot. . . The gravamen of the offense charged is not necessarily in the wrongful intent of the theater, but in the baneful effect upon the public."

As we stated earlier, *Dumas v. Todd,* 93 Ga. App. 540 (92 SE2d 265) appears to be in conflict with *Jorman* and *Barker.* In that case the petition alleged that the sellers of property at an auction advertised that a drawing would be held at the auction whereby some person present at the sale would receive an automobile. When plaintiff could not produce the stub to match the ticket drawn which had his name on it, the defendants refused to award him the automobile. In regard to the lottery feature of the case, the court held summarily as follows: "Since there was no consideration shown, the giving of an automobile under the circumstances described herein does not come within the scope of a lottery device. See *Equitable Loan & Security Co. v. Waring,* 117 Ga. 599 (44 SE 320, 62 LRA 93, 97 ASR 177); *Barker v. State,* 56 Ga. App. 705 (193 SE 605), and *Jorman v. State,* 54 Ga. App. 738 (188 SE 925)." It is apparent that the court felt that the cited cases were distinguishable; but since it does not appear that no one bid on or purchased property at the sale in *Dumas,* we are unable to distinguish it. This

being so, it must yield to the older cases of *Jorman* and *Barker* and will not be followed.

But *Dumas* must yield not only because of adherence to precedent, but also because *Barker*, in particular, was correctly decided on a solid basis. In *Meyer* and the cases preceding *Barker*, supra, the schemes were held to be lotteries or gift enterprises even though the price or cost of the chances were completely merged and concealed in the regular price of the items sold. The price received from the customers was deemed to be consideration, and *pecuniary* consideration, as an aggregate price, for both the thing sold and the chance, and it was considered immaterial that the purchaser received value for his money or that the sale price was not increased. *Barker* simply applied this rule without being confused by the "no purchase necessary" aspect of the promoter's rules, giving effect to the fundamental principle found in our anti-lottery statutes and the decisions applying them—the test of a lottery is in its working rather than in its wording.

The working of the sales promotion scheme in this case amply demonstrates that it was a prohibited lottery or gift enterprise under the law of Georgia; for not only was there present a class of persons who made purchases in addition to receiving their Derby tickets, thus supplying a pecuniary consideration for all the chances in bulk, but plaintiff was herself a faithful member of that paying class. We might also observe, as have some courts, that schemes such as that involved here have a particularly harmful effect because they inject into a natural free market dealing with basic commodities of everyday living all of the baneful consequences of a lottery. In this regard a remark of the United States Supreme Court in 1850 seems to apply with great force to this type of scheme being operated in the food business: "Experience has shown that the common forms of gambling are comparatively innocuous when placed in contrast with the widespread pestilence of lotteries. The former are confined to a few persons and places, but the latter infests the whole community; it enters every dwelling; it reaches every class; it preys upon the hard earnings of the poor; it plunders the ignorant and simple." Phalen v. Commonwealth of Virginia, 49 U. S. (8 How.) 163, 168 (12 LE 1030). The midways of our

county and state fairs bring some of the worst offenders. The gambling, openly exhibited, is nearly always a lottery of one kind or another, and children as well as adults are permitted, nay enticed, to participate.

In the posture in which this case reaches us it so happens that the deposition of the plaintiff is a vital part of the record, and it also happens that this deposition, in addition to confirming the operation by defendant of a prohibited lottery or gift enterprise, reveals the baneful consequences of such a scheme in general and the particularly bitter fruit which this plaintiff reaped in the peculiar circumstances of the case. For here the plaintiff traveled approximately a mile from her home to defendant's store almost daily, and sometimes twice daily, accumulating chances on cash prizes and invariably parting with her money to make a purchase, if only of two packages of cigarettes, in order to get the chance tickets, continuing the hope that chance, instead of teasing her with small favors, would bestow upon her the grand prize of $500 so that she could make a trip to Savannah to consult a doctor for a serious illness from which she was suffering. Yet all the while it was her impression that defendant, in distributing the chance tickets, was "looking for the money for the groceries" and that she was "paying a good price for them" which, at the advertised prices she paid when receiving her tickets, was a "high price ticket."

On the morning of July 29th the plaintiff—remembering the date because of her remark that she was going to the doctor in Savannah if she won—was ill to the extent that she didn't feel like getting up and traveling to defendant's store to check the poster showing the winning tickets. Hence, the television program was relied upon as the announcer of the choice of Chance, the choice being revealed to her in this manner: "My daughter, she was sitting in the living room, she said 'Oh Mamma, you've won the money, you can go to Savannah now.'"

And so she thought her pilgrimages to defendant's store had, at last, brought forth the pie from the sky. Thus encouraged, she got up and changed clothes, determined to "drag" or "creep" to defendant's store in order to verify her ticket and claim the prize, only to find chaos and confusion surrounding the erection of the correct verification poster for that week, announcing to

her as a fact, because of the peculiar circumstances of this case, what was said metaphorically long ago: "What Chance has made yours is not really yours."[2] And perhaps there was somewhere in the recesses of her mind as she turned to go home, empty-handed, her illness heavier than before, a half-articulated thought similar to that of the reflections of the ship-wrecked sailors in the life boat who, after rowing so far and trying so hard to bring themselves at last to that wonderful place where a miraculous rescue would surely be certain, were forced to the realization that there was no such place and that it was all a cruel hoax and an illusion, leaving them to make their own way through the sea as best they could: "If this old ninny-woman, Fate, cannot do better than this, she should be deprived of the management of men's fortunes."[3] Perhaps legislatures and courts are powerless to control Fate; but as best they can they have deprived Chance of the management of men's fortunes through lotteries and gift enterprises. It only remains for the appropriate law-enforcement officials to perform their duty.

It may be that public opinion has changed regarding this matter. The innate disposition to gamble may have brought the people of this State to an acceptance of the lottery as a part of life. The operation of so many schemes of the type here involved may be strong evidence of that. But if it be true, we should follow New Hampshire, New York, Nevada and perhaps others of the States in legitimating the lottery. It is a matter of public policy and should be determined appropriately by constitutional amendment and statutory change. Until that is done we cannot permit respect for law to dip further by giving our sanction to an unlawful operation, whether ingenious, ingenuous or both.

*Judgment affirmed. Felton, C. J., and Hall, J., concur.*

---

[2] Non est tuum, fortuna quod fecit tuum. Lucilius, as quoted by Seneca, Epistulae ad Lucilium, Epis. viii, sec. 10.

[3] Crane, *The Open Boat,* Scribner's Magazine, Vol. 21, pp. 728-740, June, 1897 (The Complete Short Stories and Sketches of Stephen Crane 339, 346 (Doubleday & Co., 1963)).